*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GEOFFREY M. RADVANSKY,

*Plaintiff-Appellant,*

*v.*

No. 06-3357

CITY OF OLMSTED FALLS, et al.,

*Defendants-Appellees.*

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00634—John R. Adams, District Judge.

Argued: June 1, 2007

Decided and Filed: July 27, 2007

Before: GIBBONS and COOK, Circuit Judges; and CLELAND, District Judge.[*]

---

**COUNSEL**

**ARGUED:** L. Bryan Carr, CARR LAW FIRM, Mayfield Heights, Ohio, for Appellant. John T. McLandrich, MAZANEC, RASKIN, RYDER & KELLER CO., Cleveland, Ohio, for Appellees. **ON BRIEF:** L. Bryan Carr, Leonard F. Carr, CARR LAW FIRM, Mayfield Heights, Ohio, for Appellant. John T. McLandrich, James A. Climer, Robert F. Cathcart, MAZANEC, RASKIN, RYDER & KELLER CO., Cleveland, Ohio, for Appellees.

---

**OPINION**

---

COOK, Circuit Judge. Plaintiff Geoffrey Radvansky appeals from a jury verdict rendered for Defendant police officers Ralph Saxer and Thomas Telegdy in his 42 U.S.C. § 1983 action against them. Radvansky appeals to the Sixth Circuit for the second time in this case, as he successfully sought a reversal of the district court's grant of summary judgment to the defendants on this claim in *Radvansky v. City of Olmsted Falls* (*Radvansky I*), 395 F.3d 291 (6th Cir. 2005). He now seeks a reversal of the district court's denial of his motions made pursuant to Fed. R. Civ. P. 49, 50, and 59; challenges the court's jury instructions as prejudicially erroneous; and requests a grant of fees due to his previous success in this court. Because the jury's verdict was reasonable, the instructions not prejudicial, and Radvansky not a "prevailing party," we affirm.

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

**I**

Geoffrey Radvansky was arrested for burglary on the night of May 15, 2001, by Olmsted Falls, Ohio, police officers Ralph Saxer and Thomas Telegdy ("the officers"). A grand jury indicted him, but the prosecutor eventually dismissed the charges, apparently after Radvansky agreed to pay the owner of the burgled home $400 in restitution. Radvansky then sued officers Saxer and Telegdy, along with the City of Olmsted Falls, the Olmsted Falls Police Department, and several other police personnel involved in the incident. Radvanksy asserted myriad claims, including a Fourth Amendment false arrest claim under 42 U.S.C. § 1983. The district court granted summary judgment to the defendants on all claims. This court reversed the district court's judgment on the Fourth Amendment claim but affirmed in all other respects in *Radvansky I*, concluding that a material issue of fact remained whether the officers had probable cause to arrest Radvansky.

A jury then heard the case and rendered a general verdict for the defendants, with interrogatory answers confirming that the officers arrested Radvansky with probable cause. Radvansky moved for a directed verdict or a new trial and also for relief under Fed. R. Civ. P. 49, complaining that the jury's answers to the interrogatories were "incorrect and inconsistent." He failed, however, to raise the interrogatories issue before the court discharged the jury. The district court denied each motion. Radvansky now appeals.

For at least some of the time between June 2000 and May 2001, Radvansky lived at 26060 Redwood Drive in Olmsted Falls under an oral agreement with Derrick Rosemark, the home's owner, who apparently lived there as well. Around the end of April or the beginning of May 2001, Rosemark called the Olmsted Falls Police Department and spoke with Detective Caine about problems he was experiencing with Radvansky, who, he told Caine, had left for Florida without paying him all the rent he was due. Depending on one's view of Radvansky's status at the time—whether he had abandoned the premises or remained a tenant—Caine may have given Rosemark erroneous legal advice, telling him that he could lock Radvansky out of the house. The extent to which Caine told other officers in the department about this conversation remained in dispute at trial; both Saxer and Telegdy testified that they did not know about this conversation prior to arresting Radvansky.

On May 14, 2001, Radvansky sought to reenter the house. Finding the locks changed, he walked across the street and asked neighbor Ken Winland for "a butter knife or something [he] could use to break in," because he had "some guns in there," and he wanted to get his "personal stuff." Winland testified that he gave Radvanksy nothing and instead told him to call the police. Radvansky testified that Winland gave him "an implement." Either way, Radvansky departed and Winland told his wife to call the police, which she did. Officer Telegedy and Officer Dan Gilles responded to the call, canvassed the area for a "suspicious person" and, finding no one, left.

The next evening, May 15, 2001, Radvansky returned to try again. Armed with a curtain rod or shower pole and a towel, Radvansky was again spotted by Winland, who again told his wife to call the police. Shortly thereafter, Winland heard the sound of breaking glass coming from the back of the house. According to Radvansky, he was at the back of the house trying to "tilt the screen—or the glass door sideways, but [he] couldn't get the rod in there to lift up the wooden piece," so he "started panicking." He was nervous about "getting those guns," because "he did not want them to fall in the wrong hands." So, he "panicked and . . . kicked the window that goes into the lower living room." He crawled through the window and retrieved a "stun gun" that he had hidden "up in the rafters" in "the utility room." He apparently went to his bedroom to find his lock destroyed and his belongings strewn about. He claims he cut his hand while attempting to unlock the door.

When Officers Saxer and Telegdy arrived, they approached the house cautiously, moving towards the rear of the house with weapons drawn. The officers noticed that the window was broken and the window screen was cut. Radvansky then emerged quickly from the building. They noticed that his hand was bleeding and ordered him to the ground. The officers asked if he was armed, and he responded that he had a stun gun. The stun gun was later found inside the house near the broken window. He protested to the officers that he lived at the house, and when the officers removed his wallet, his driver's license and several paychecks listed 26060 Redwood as his address. He offered a note from Rosemark, which the *Radvansky I* court interpreted to read as follows:

> Geoff, I have locked the door for my own security. I am informing you not [sic] break in. [A]lso there is a matter of partial rent you owe of $100 partial rent. None of these belongings until this is settler [sic]. Otherwise I am kicking you out of this house. [D]o not attempt to enter the premises. You can call me at work to settle this.
>
> I also informed the [O]lmsted [F]alls police department of you leaving the property and not to enter the house.

395 F.3d at 298 n.2. He also told the police that he had merely "lost his keys." The officers called in his social security number to the police dispatcher to run a LEADS report, which collects the individual's address and his traffic offense history. The LEADS indicated the same address as the driver's license, though the officers were unsurprised because the LEADS information comes from the Bureau of Motor Vehicles.

The officers handcuffed him and arrested him. They then took him to the hospital in an ambulance, where doctors treated his hand wound. Other officers showed up to investigate the scene, and, during this investigation, Sergeant Gilles called the Olmsted Falls prosecutor to discuss whether to charge Radvansky with burglary. Radvansky was later booked and spent the night in jail.

## II

### Fed. R. Civ. P. 50 & 59 Challenges

**Standard of Review**

Radvansky seeks reversal of the district court's denial of his Fed. R. Civ. P. 50(b) and 59 motions for judgment as a matter of law or, in the alternative, a new trial. For Radvansky to succeed, he must overcome the substantial deference owed a jury verdict. We review a district court's denial of a Rule 50(b) motion de novo, applying the same deferential standard as the district court: "The motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001) (citing *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174-76 (6th Cir. 1996)). Neither the district court nor the reviewing court may reweigh the evidence or assess the credibility of witnesses. *Id.* at 600 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). We review a district court's denial of a new-trial motion for abuse of discretion, reversing only if we have a "definite and firm conviction that the trial court committed a clear error of judgment." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000) (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)).

**Merits**

Radvansky's challenge turns on the legitimacy of the jury's finding that the officers had probable cause to arrest him. If no reasonable jury could so conclude, we must reverse. Thus, we

must examine the facts presented to the jury to assess whether a reasonable juror could conclude that they satisfy the well-known probable cause standard. Briefly, the Fourth Amendment requires that "a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime." *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Probable cause is defined by asking "whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck*, 379 U.S. at 91. "Probable cause is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[1] *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). Ohio's burglary statute prohibits a "person, by force, stealth, or deception . . . [to] [t]respass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." Ohio Rev. Code Ann. § 2911.12(A)(4). The Code also prohibits such a trespass with "purpose to commit . . . any criminal offense" therein. *Id.* § 2911.12(A)(1). Our inquiry, then, is whether a reasonable jury could conclude that the officers had probable cause to arrest Radvansky for burglary.

The district court denied Radvansky's Fed. R. Civ. P. 50(b) and 59 motions because it concluded that the jury reasonably found that the officers arrested Radvansky with probable cause. The court pointed to several facts:

> [1] There was evidence presented at trial that Plaintiff forcibly entered the residence at night, was carrying a weapon at the time, and that a neighbor identified Plaintiff as the person who had attempted to gain access to the home on the evening prior.

> [2] There was also evidence presented that Plaintiff was dishonest about why he had broken into the home. [The court explained in a footnote that] Plaintiff told police officers that he broke into the residence because he had lost his keys.

> [3] Regardless of Plaintiff's protests and documentary evidence that he lived at the residence, it would have been reasonable for the jury to infer that he was not being truthful with the officers and that the officers were reasonable in discrediting his statements and documents.

> [4] It would also be reasonable for the jury to find that there was a fair probability that Plaintiff had committed, or was about to commit a crime.

> [5] It is also noted that because Plaintiff testified at trial, the jury had the opportunity to listen to his testimony and observe his behavior on the stand. The jury could have found Plaintiff lacked credibility and discredited his entire testimony and the evidence he presented.

Our review confirms that the district court correctly identified key facts heard by the jury supporting its conclusion that the officers acted with probable cause.

The jury's answers to interrogatories also address and allay the concerns articulated by this court in *Radvansky I*. Viewing the evidence in the light most favorable to Radvansky, the earlier panel was troubled by the possibility that the police arrested Radvansky based solely on Rosemark's

---

[1] Radvansky devotes much of his brief to the project of pointing out the failings of the police to shore up their investigation after placing him in custody; none of this is relevant to our inquiry, which examines only the facts available to the officers as they made their decision to arrest him.

statement to Detective Caine that Radvansky had abandoned the property. Citing a Seventh Circuit case and a Ninth Circuit case for the proposition that "[i]n the criminal context [courts] have held that statements made by landlords and tenants about domestic disputes are by themselves insufficient to establish probable cause," the court opined that a reasonable jury could find that the officers had done just that. *Radvansky I*, 395 F.3d at 305 (citing *Seminara v. City of Long Beach*, Nos. 93-56395, 93-56512, 1995 WL 598097 (9th Cir. Oct. 6, 1995), and *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994)). The court also reasoned that a jury could conclude that the officers "ignored substantial exculpatory evidence" by disregarding Radvansky's repeated protestations that he lived at the residence, the note to him from the landlord, and the documents in his wallet, including his driver's license, which indicated the Redwood address as his residence. *Id*. at 305-07.

The jury that heard the evidence at trial, however, came to contrary conclusions about each of the *Radvansky I* court's concerns. Although the court viewed the evidence as suggesting that the officers had "pre-existing knowledge about the dispute between Radvansky and Rosemark," *id*. at 307, the jury concluded otherwise, answering "No" to interrogatories that asked whether they found by a preponderance of the evidence that the defendants "had prior knowledge of the existence of a dispute between Plaintiff Radvansky and Mr. Rosemark concerning Plaintiff Radvansky's privilege to live at the Redwood Dr. residence." Underscoring this finding, the jury answered "No" to interrogatories that asked whether the defendants were "aware of Derrick Rosemark's statement to Detective Caine that Plaintiff Radvansky no longer lived at the Redwood Dr. residence." Redundantly but sensibly, the jury also answered "No" to interrogatories that asked whether it found "by a preponderance of the evidence" that the officers "relied solely on Mr. Rosemark's representations in making the arrest and ignored substantial exculpatory evidence to the contrary." This was also, of course, contrary to the court's concern that the officers ignored Radvansky's protestations and evidence. *Id*. at 306.

The jury also viewed the evidence establishing Radvansky's residence at the home differently than the *Radvansky I* court, answering "Yes" to an interrogatory that asked whether it found "by a preponderance of the evidence that Plaintiff Radvansky abandoned the Redwood Dr. residence prior to the time of arrest," and "No" to an interrogatory that asked whether "Plaintiff Radvansky was a tenant at the Redwood Dr. residence at the time of the arrest." The jury's conclusion can be summed up by its affirmative answers to interrogatories 19 and 20, which asked whether the jury concluded "by a preponderance of the evidence" that the officers "at the time of the arrest had reasonably reliable information, independent of Mr. Rosemark's allegations, that there was a fair probability Plaintiff Radvansky had committed, was committing, or was about to commit a crime." In short, the jury concluded the officers acted with probable cause. *See Beck*, 379 U.S. at 91.

Moreover, examining the *Radvansky I* court's main concern in the context of the officers' trial testimony, the testimony suggests that the officers were not aware of Rosemark's statements to Detective Caine, and thus Rosemark's statements did not motivate their actions. Officer Telegdy testified at trial that he had never heard anything about Rosemark's conversation with Detective Caine prior to arresting Radvansky (or, for that matter, prior to the day of the trial). He also testified that he had no idea who Radvansky was prior to the arrest, despite the fact that he investigated the incident on May 14.[2] Officer Saxer had no recollection at trial about what was said to him the night

---

[2] Counsel impeached him on this point and several others with references, some relatively vague, to his deposition testimony, which is not in the record but relied upon by the *Radvansky I* panel, *see, e.g.*, 395 F.3d at 304, but Telegdy maintained his position. He later testified that he had heard Radvansky's name prior to the incident on May 15, but there was no additional explanation. In any event, discrepancies between the deposition testimony relied on by the *Radvansky I* panel and the trial testimony are irrelevant given the standard of review, which limits our review to the reasonableness of the jury's conclusions given the evidence actually presented to the jury. *See, e.g.*, *Gray*, 263 F.3d at 599.

of May 15 and gave no indication that he was aware of the conversation between Rosemark and Caine at the time of the arrest. He provided only a vague recollection that Officer Telegdy "mentioned something about possibly there might be a problem on Redwood Drive," and he could not remember what Officer Gilles told him before he left for patrol the night on May 15.

In sum, the jury heard testimony sufficient to support its conclusion that the officers arrested Radvansky with probable cause. Thus, we affirm the district court's denial of Radvansky's Fed. R. Civ. P. 50(b) motion. For the same reasons, the district court did not abuse its discretion in denying Radvansky's Fed. R. Civ. P. 59 motion.

## Jury Instructions: State of Mind Charge

### Standard of Review

We "review a properly preserved objection to a jury instruction by determining whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) (internal quotations omitted). We "will reverse a judgment where the jury instruction fails accurately to reflect the law." *Id.* (internal quotations omitted). "In addition, we may reverse the trial court based on a faulty charge only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.*

### Merits

Radvansky complains about the district court's instruction regarding the officers' required state of mind in carrying out the arrest, as reflected in a set of interrogatories that asked the jury whether it found "by a preponderance of the evidence that [each officer] intentionally or recklessly committed acts that violated Plaintiff Radvansky's federal constitutional right not to be arrested or seized without probable cause?" A separate question asked whether the officers (individually) "negligently" committed the same acts.

Putting aside for the moment the issue of state-of-mind requirements and constitutional violations, the instruction here may have been needless or redundant, but not prejudicial. As worded, the interrogatories asked if the officers committed an act, with varying states of mind, that violated Radvansky's constitutional rights. Because the jury answered that the officers had probable cause to arrest Radvansky, it appropriately answered "No" to each question. The officers' states of mind as they arrested Radvansky were irrelevant given the jury's conclusion that the arrest with probable cause did not violate the Constitution.

Radvansky correctly points out that the appropriate inquiry for a Fourth Amendment claim such as this is whether the officers acted "reasonabl[y]" in assessing the facts and circumstances known to them at the time of the arrest or seizure, *see Beck*, 379 U.S. at 91, but, as discussed above, the interrogatories correctly queried the jury whether the officers had reasonably reliable information when they arrested Radvansky. Taken as a whole, the jury instructions do not appear confusing, misleading, or prejudicial, and the jury's responses to the interrogatories suggest it understood the applicable law and entered its conclusions accordingly.

## Jury Instructions: Fed. R. Civ. P. 49 Challenge

### Standard of Review

"On appeal, a district court's interpretation of a verdict rendered pursuant to Fed. R. Civ. P. 49 is reviewed for an abuse of discretion." *Cent. On Line Data Sys., Inc. v. Filenet Corp.*, Nos. 95-1016, 95-1054, 1996 WL 483031, at *11 (6th Cir. Aug. 23, 1996) (citing *P & L Constr., Inc. v. Am.*

*Norit Co.*, 5 F.3d 133, 138 (5th Cir.1993), and *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1524 (6th Cir. 1990)).

**Merits**

Radvansky challenges the jury's responses to the interrogatories as "incorrect and inconsistent" pursuant to Fed. R. Civ. P. 49. The rule provides as follows:

> When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

Fed. R. Civ. P. 49(b).

Radvansky's brief offers no insight as to how the jury's answers run afoul of the rule; it instead makes the general point, addressed above, that "[t]here was no legally sufficient evidentiary basis for a reasonable jury to find for Appellees." The district court denied Radvansky's motion, concluding that he forfeited the argument by failing to raise the issue prior to the jury's discharge. The court addressed the substance of Radvansky's challenge as well and found no inconsistency in the jury's answers.

Although there exists a dearth of recent authority in this circuit, it appears our court and others sensibly have held that a party must make its Rule 49(b) objection prior to the district court discharging the jury. In an unpublished opinion, our court explained,

> It is well-settled that if, after answers to special interrogatories are read, a party does not object to the discharge of the jury or raise any issue with respect to the jury's responses, that party should be deemed to have waived any objection as to inconsistency, ambiguity, or lack of clarity in the answers.

*Filenet Corp.*, 1996 WL 483031, at *11 (citing *Lockard v. Mo. Pac. R.R. Co.*, 894 F.2d 299, 304 (8th Cir. 1990), and *White v. Celotex Corp.*, 878 F.2d 144, 146 (4th Cir. 1989)). As the court further explained, "'The purpose of the rule is to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury. This prevents a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict.'" *Id.* (quoting *Lockard*, 894 F.2d at 304). Our court relied on the same rule in another unpublished opinion in 1989. *Catalina v. City of Columbus*, Nos. 88-4187, 88-4089, 1989 WL 123240 (6th Cir. Oct. 17, 1989). The *Catalina* court held that the party "waived her objection to any perceived inconsistency by failing to enter an objection to the special verdict form returned by the jury before the jury was discharged" and that this "failure to make such an objection in a timely fashion deprived the trial court of the opportunity to correct discrepancies, if any existed, in the form of the verdict returned by the jury." *Id.* at *1.

The Federal Circuit recently analyzed a Rule 49(b) waiver issue in a context requiring it to apply Sixth Circuit precedent. *See L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318-19 (Fed. Cir. 2006). The Federal Circuit pointed to *Tennessee Consolidated Coal Co. v. United Mine Workers of America*, 416 F.2d 1192, 1200 (6th Cir. 1969), for the proposition that "[u]nder Sixth Circuit law, a party waives its objection to inconsistency in a jury's verdict if the party had an adequate

opportunity to object but failed to do so." *L & W*, 471 F.3d at 1318-19. *Tennessee Consolidated* comports with this court's more recent (albeit unpublished) assessments of the issue and controls the issue here. Radvansky's counsel failed to object and also declined the court's offer to allow him to inspect the verdict forms and poll the jury. We deem the argument waived on this ground as well.

Notwithstanding waiver, we discern no inconsistency in the jury's interrogatory responses, and the challenge fails on its own merits. Each of the jury's answers comports with its conclusion that the officers arrested Radvansky with probable cause; each answer coheres with both the general verdict and the other specific interrogatory answers.

## Attorney's Fees

### Standard of Review

A district court's determination of prevailing-party status for awards under attorney-fee-shifting statutes—such as 42 U.S.C. § 1988—is a legal question that we review de novo. *See Bridgeport Music, Inc. v. London Music, U.K.*, No. 05-5045, 2007 WL 930409, at *2 (6th Cir. Mar. 28, 2007) (citing *Bailey v. Mississippi*, 407 F.3d 684, 687 (5th Cir. 2005), for the proposition that after *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001), "every Circuit to address the issue has determined that the characterization of prevailing-party status for awards under fee-shifting statutes . . . is a legal question subject to *de novo* review"); *see also Sole v. Wyner*, 127 S. Ct. 2188, 2194-97 (2007) (reviewing de novo prevailing-party status without explicitly stating the standard of review); *Toms v. Taft*, 338 F.3d 519, 528-30 (6th Cir. 2003) (same).

### Merits

Radvansky believes he is entitled to attorney's fees under 42 U.S.C. § 1988 because he obtained a reversal of summary judgment in *Radvansky I*. Section 1988 provides the district court with authority to award attorneys fees to a "prevailing party." He selectively cites *Hanrahan v. Hampton*, 446 U.S. 754 (1980), for the proposition that to be considered a "prevailing party" within the meaning of 42 U.S.C. § 1988, a plaintiff need not have obtained a favorable final judgment. But he ignores the following proposition: "Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims." *Hanrahan*, 446 U.S. at 758. And he ignores this general principle concerning § 1988: "Our '[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." *Buckhannon*, 532 U.S. at 603-04 (quoting *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)); *see also Sole*, 127 S. Ct. at 2192 ("A plaintiff who achieves a transient victory at the threshold of an action can gain no award under that fee-shifting provision if, at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded.").

We have rejected Radvansky's proposed interpretation of "prevailing party" in the past. *E.g.*, *Toms*, 338 F.3d at 528 (6th Cir. 2003) (stating that because plaintiffs "obtained neither a judgment on the merits nor a court-ordered consent decree, they are not eligible for attorney's fees"). And Judge Posner likely put it best:

> Once a plaintiff obtains substantive relief that is not defeasible by further proceedings, he can seek interim fees and the district court has the power to award them. But until there is some relief, there can be no award. A procedural victory that may be a way station to utter substantive defeat creates no right to fees. It makes no difference whether the procedural victory is the denial of a motion to dismiss, the denial of summary judgment, the denial of a motion for a directed verdict, appellate reversal of the grant of such a motion (as in *Hanrahan*), or, as in this case, appellate

reversal of the grant of summary judgment—for that is the equivalent of a denial of summary judgment and leaves the plaintiff still having to prove his case at trial.

*Richardson v. Penfold*, 900 F.2d 116, 119 (7th Cir. 1990) (citations omitted).

Radvansky also invokes Fed. R. Civ. P. 54(d) and Fed. R. App. P. 39 as bases for a fee award. His Rule 54(d) argument fails for the same reason as his § 1988 argument—the rule grants fees to prevailing parties only, and he was not a prevailing party. *Hinchman v. Moore*, 312 F.3d 198, 206 (6th Cir. 2002). His Rule 39 argument fails on multiple fronts. Radvansky did not comply with Fed. R. App. P. 39(d) as he failed to submit his request for costs within fourteen days after this court filed its first *Radvansky* judgment. The plain language of the rule obviates his request as well: because the Rule provides that its framework applies "unless the law provides . . . otherwise," Fed. R. App. P. 39(a), and because § 1988 provides for fees and costs, Rule 39 does not apply. Thus, we affirm the district court's denial of Radvansky's various fees and costs requests.

## III

For the foregoing reasons, we affirm.