**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1294n.06

No. 11-2624

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Dec 18, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| DELPHI CORPORATION, *ETAL*., | ) ) | |
| Defendants, and | ) ) | |
| PAUL R. FREE, | ) ) | |
| Defendant-Appellant. | ) | |

BEFORE:    MARTIN and GRIFFIN, Circuit Judges; and BECKWITH, Senior District Judge[*]

**BECKWITH, Senior District Judge.**  Defendant-Appellant Paul R. Free appeals from the judgment of the United States District Court for the Eastern District of Michigan finding him civilly liable for a number violations of the federal securities laws.  For the reasons that follow, we affirm.

I.

Generally speaking, this case concerns alleged fraudulent accounting practices committed by Defendant-Appellant Paul R. Free during his employment as the chief accounting officer

---

[*]The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

1

("CAO") for Delphi Corporation ("Delphi"). Delphi is an automotive parts manufacturer and supplier that was spun off from General Motors Corporation ("GM") in 1999. As the CAO for Delphi, two of Free's major responsibilities were insuring that Delphi's accounting practices complied with Generally Accepted Accounting Principles ("GAAP") and rules promulgated by the Financial Accounting Standards Board ("FASB") to file accurate and truthful quarterly and annual financial reports for Delphi with the Securities and Exchange Commission ("SEC").

The SEC brought a civil enforcement action against Free, Delphi and a number of other former Delphi officers and executives as a result of the accounting for four transactions which ultimately caused Delphi to issue amended financial reports for 2000 and 2001. The jury found Free liable in some respect as to all four transactions, but Free appeals only the jury's verdicts on two of the transactions. Nevertheless, a brief summary of all four transactions and the reasons the accounting for them was erroneous will be helpful.

A.  The GM Settlement Transaction

After the spin off from GM was completed, there were a number of warranty claims outstanding against GM and GM claimed that Delphi was financially responsible for at least a portion of those claims. Additionally, there was a dispute between GM and Delphi concerning pension liabilities for certain employees whose employment changed from GM to Delphi then back to GM. Delphi ultimately agreed to pay GM $237 million to settle these issues, but the settlement did not allocate the money between warranty claims and pension claims. In accounting for the transaction, Free allocated the bulk of the settlement to the pension claims, which allowed Delphi to record a reduction in its outstanding pension liabilities. Had the settlement been allocated to the warranty claims, it would have been an expense which would have reduced Delphi's net income.

2

## B.  The BBK Transaction

The BBK Transaction and the Bank One Transaction, discussed next, are separate transactions but were essentially identical in nature and purpose.  The evidence at trial showed that during 2000, one of Delphi's goals was to increase its cash flow by reducing its inventory and Delphi had set a specific cash target to meet.

In furtherance of meeting this goal, on December 27, 2000, Delphi sold its entire inventory of engine generator cores and battery cores to a company called BBK, Ltd. for approximately $70 million.  At the same time, Delphi entered into an agreement with BBK to repurchase the entire stock of generator cores and battery cores only six days later for approximately $71 million.  Free recorded this transaction as a sale, instead of inventory financing, which allowed Delphi to increase its income for 2000 by $70 million.  If Free would have recorded the transaction as inventory financing, Delphi would have had to show an outstanding liability (the $71million obligation to repurchase the cores) and there would have been no increase in Delphi's income.

## 3.  The Bank One or PGM Transaction

Delphi had in inventory a large supply of platinum group metals ("PGM") - platinum, palladium, and rhodium - which are used in manufacturing catalytic converters.  GM required Delphi to maintain a large inventory of PGM's to ensure against a supply disruption.  As part of the spin off, GM had agreed to purchase a large part of Delphi's PGM inventory in early 2001, but during 2000 was giving indications that it was going to renege on this commitment.

Again, supposedly as an effort to reduce its inventory and to increase its cash flow, in December 2000, Delphi sold its entire PGM inventory to Bank One for approximately $199 million.

3

At the same time, Delphi entered into a "forward purchase agreement" with Bank One wherein it agreed to repurchase the entire PGM inventory from Bank One in 30 days for approximately $202 million. The sale of the PGM inventory technically gave Bank One the right to resell the inventory to a third party, and if it had done so, at the end of the 30 days, Bank One was obligated to pay Delphi the cash value of the inventory. As a practical matter, however, Bank One could not take possession of the PGM inventory both because it was spread out across the world and because some of it was actually in slurry form and was being used in production by Delphi. To cover this problem, Bank One paid Delphi a "bailment fee" for keeping the PGM inventory.

Similar to the BBK transaction, Free recorded this transaction as a sale of the PGM inventory to Bank One rather than as inventory financing. This permitted Delphi to increase its income for 2000 by the $198 million "sale price" of the inventory. Had the transaction been recorded as inventory financing, Delphi would have had an outstanding liability of $201 million instead of an increase in income.

### D. The EDS Transaction

Evidence at trial showed that it was an accepted industry practice for a customer to demand "rebates" or "blood money" from its suppliers. In other words, it was an industry custom for a customer to demand from and be paid kickbacks by its suppliers. Apparently GM was particularly assertive in demanding and receiving "blood money" payments from Delphi. In any event, during 2001, Delphi decided to turn the "blood money" tables on its suppliers and, in particular, demanded a $50 million "rebate" from EDS, its computer systems vendor. Delphi and EDS negotiated the "rebate" during the latter half of 2001 and finally agreed that EDS would make a $20 million payment in December 2001 and a $30 million payment in early 2002.

4

EDS made the $20 million payment in December 2001 and Free recorded the transaction as a $20 million decrease in expense, which resulted in an increase in income for Delphi. Supposedly unknown to Free, there was a side letter agreement between Delphi and EDS wherein Delphi agreed to repay the $20 million in 60 monthly installments. Delphi's agreement to repay EDS made the "rebate" a loan. Consequently, the transaction should have been recorded as a liability instead of income.

### E.  Procedural History

The SEC filed a civil enforcement action against Free, Delphi and others asserting eight different securities violations with respect to each of the above transactions. As is relevant to this appeal, however, the SEC charged that Free violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b -5, 17 C.F.R. § 240.10b-5, in accounting for the Bank One and EDS Transactions. Together, Section 10(b) and Rule 10b-5 prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008). Section 10(b) and Rule 10b-5 claims require proof of scienter, *i.e.*, a mental state indicating intent to deceive, manipulate or defraud. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999). After a lengthy trial, the jury returned verdicts finding that Free violated Section 10(b) and Rule 10b-5 in accounting for these transactions.

Free then filed a motion for judgment as a matter of law, or for a new trial, pursuant to Rule 50 of the Federal Rules of Civil Procedure. Free argued that the evidence was insufficient for the jury to find that he acted with intent to defraud. Free contended that while he might have made accounting mistakes and perhaps exercised erroneous judgment, he acted in good faith at all times.

5

Free's position was that he took reasonable steps to understand the transactions at issue, reasonably relied on information provided to him by subordinates, and reasonably relied on advice provided by Delphi's outside auditors in approving the accounting treatment for these transactions. He also argued that the SEC failed to establish some of the traditional indicia of scienter, such as a motive to profit from the transactions.

In a written decision denying Free's motion for judgment as a matter of law, the district court found that the jury could have concluded that Free was reckless, and therefore acted with scienter, in accounting for these transactions based on the following evidence:

1. Free once told Barbara Novak, Delphi's in-house securities lawyer, "when there's aggressive accounting, you really don't want to disclose it because it will be a red flag to the SEC[.]" The district court concluded that the jury could find based on this testimony that Free's approach to the SEC's disclosure requirements was dishonest.

2. In discussing the GM Settlement transaction with Pete Bible, GM's CAO, Free was "uncharacteristcally abrupt" about the accounting for it. The district court stated that the jury could have concluded that Free was not honest with Bible about the accounting for the GM transaction, and, hence, was not being honest about the accounting for the other transactions.

3. Free's testimony on some subjects was contradicted by the testimony of other witnesses. Based on those contradictions, the district court concluded that the jury could have discounted much of Free's testimony.

4. In early February 2001, one of Free's subordinates, Laura Marion, provided Free with an analysis of the PGM and BBK transactions which suggested that these were financing transactions and not actual sales of these inventories.

6

The district court, therefore, denied Free's motion for judgment as a matter of law or for a new trial. The district court ordered Free to disgorge $38,000, which represented the increase in bonus that Free received as a result of the improper accounting for all of the transactions, and imposed a civil penalty of $80,500. The district court also enjoined Free from committing violations of the same securities laws in the future.

Free now appeals the judgment of the district court, contending that the evidence was insufficient for the jury to find that he acted with scienter in accounting for the Bank One and EDS Transactions.

## II.

The Court of Appeals reviews *de novo* the district court's denial of a party's renewed motion for a judgment as a matter of law. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). We "appl[y] the same deferential standard as the district court," and may grant the motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Id.* In conducting its review, the Court must not "reweigh the evidence or assess the credibility of witnesses." *Id.* We review a district court's denial of a motion for a new trial for abuse of discretion, reversing only if we have a "definite and firm conviction that the trial court committed a clear error of judgment." *Id.*

## III.

Free argues that the evidence was insufficient for the jury find that he acted with scienter with respect to the subject transactions. As stated above, scienter is a state of mind encompassing intent to deceive, manipulate or defraud. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir.

7

1999). Scienter may be established by proof of reckless conduct, *i.e.*, "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least have been so obvious that any reasonable man would have known of it." *Id.* A traditional but not exhaustive list of factors relevant to scienter include:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007). Regarding GAAP violations, recklessness can be inferred where the defendant ignores multiple and obvious red flags that would have revealed accounting errors. *PR Diamonds, Inc. v. Chandler*, 91 F. App'x. 418, 431 (6th Cir. 2004).

In his appellate brief, Free argues, much as he did in the court below, that he acted reasonably with respect to each of the transactions. He relied on experienced subordinates to advise him on the

transactions, vetted the transactions with Delphi's outside auditors, and made an independent assessment of the facts before him in approving the accounting treatment for these transactions. Free argues that in finding that there was sufficient evidence to sustain the jury's finding that he acted with scienter, the district court cited documents that he did not see or did not know about and improperly concluded that attacks on his credibility could substitute for a culpable state of mind. On *de novo* review, however, we find that the record contains sufficient evidence to sustain the jury's verdicts. First, we find that there was sufficient evidence that Free acted recklessly or turned a blind eye to the fact that the Bank One Transaction lacked economic substance as a sale. *See, e.g., In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 281 (3rd Cir. 2006) (auditors acted with scienter by turning blind eye to accounting violations); *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance."). Second, we find that there were a number of red flags indicating that the EDS Transaction was not a true rebate that Free ignored.

The following evidence supports the jury's determination that Free acted with scienter as to the Bank One Transaction. First, Free admitted that the Bank One Transaction was unusually large, even for a company like Delphi. (Doc. No. 326, at 18-19) (Rec. 18746-18747). Second, Free knew that under standard auditing principles, unusual transactions entered into at or near the end of a reporting period require closer scrutiny to ensure their legitimacy. *Id.* at 37-38 (Rec. 18765-18766). Third, Laura Marion's analysis of the transaction, which a juror could have concluded that Free received, suggested that the transaction was a financing arrangement, and not a sale, because it included financing expenses. Fourth, Free admitted that the Bank One Transaction had elements of product financing as opposed to a sale. *Id.* at 50 (Rec. 18778). Fifth, the SEC's accounting expert,

John Garvey, testified that the Bank One Transaction did not have economic substance as a sale and that should have been obvious to Free. Doc. No. 319, at 192 (Rec. 17818) (testifying that proper accounting for Bank One Transaction "was not a close call.").

Despite at least five red flags about the legitimacy of the Bank One Transaction, Free personally did not conduct a critical investigation into it before approving the accounting. Rather, Free only superficially examined the form of the transaction rather than its substance. Indeed, it seems that Free really only examined the contract to ensure that it nominally provided for the transfer of risk of loss - which is only the bare minimum requirement to account for a transaction as a sale. Free essentially admitted that the PGM contract was structured in such a way as to shield Bank One from any risk of loss. In fact, it also guaranteed Bank One a $3 million profit for simply not reselling the inventory. Doc. No. 326 at 27 (Rec. 18755). A reasonable juror, therefore, could have concluded that Free was willfully blind, or reckless, as to the true nature of this transaction.

The jury's verdict on the EDS Transaction was also supported by the evidence. Free contends that he was never aware that the Delphi IT department reached a secret side agreement for Delphi to repay the "rebate" over five years. Again, however, there were multiple red flags that should have alerted Free that the payment from EDS was a loan and not a rebate.

First, two early drafts of the side letter described the payment from EDS as "non-refundable" but the final draft did not state that the payment was non-refundable. The jury could have reasonably concluded that the deletion of "non-refundable" from the final side-letter should have alerted Free that the payment was repayable. Also Catharine Rozanski, Free's director of financial accounting and reporting, testified that she kept the language in the side letter "intentionally vague" so that both EDS and Delphi could achieve their accounting goals. Doc. No. 316, at 124. (Rec. 17216). The jury

10

could have reasonably inferred that Rozanski told Free the purpose of the letter as well because she kept him up to date and shared with him the status of the side letters. *Id.* at 130 (Rec. 17222). This testimony suggests scienter because it indicates that Free, Rozanski, and others at Delphi were searching for ways to paper the transaction in a way that suited their objectives rather than account for it in an honest fashion.

Second, the SEC produced several documents that Free received which indicated that the "rebate" would have to be repaid to EDS. A July 27, 2001 email broke down the cost of an outsourcing proposal from EDS as $347 million but Delphi would pay $397 over the course of the project because it included "payback of the $50M they would pay us earlier." Doc. No. 388-3.[1] A September 2001 memorandum on which Free was copied recommended that the $20M "rebate" be booked to reduce headquarters expense" but "as we make future payments to EDS, the portion of the payment related to the $50 million should be carried in headquarters budget/actuals and not allocated directly to the divisions." Doc. No. 388-4. This memo suggests, in other words, that Delphi headquarters should get the credit for the payment on its current budget and also that it would take the budget hit for the future repayments to EDS. If the payment from EDS were a true rebate, there would have been no need to decide which department would bear the expense of repaying it. A strategy board presentation in April 2002 concerning the costs of the Vega 2 project with EDS, in which Free participated, contained the bullet point "Reflects $20M payment from EDS to Delphi and payback from Delphi to EDS." Doc. No. 388-22, at 7. Finally, at around this same time, Free approved payment of an invoice to EDS in the amount of $333,000, *i.e.*, one month's installment

---

[1]The "blood money" transaction initially started out as an attempt by Delphi to get $50 million from EDS - later it was decided to reduce the "rebate" to two separate payments of $20 million and $30 million. Doc. No. 316, at 108 (Rec. 17200).

11

repaying $20 million over 5 years, for "non-commutable costs." Doc. No. 388-17, at 1. Free admitted that there is no such accounting term as "non-commutable costs" and he did not really know what the term meant. Doc. No. 325, at 189 (Rec. 18668). Free testified that he approved the payment after conferring with a subordinate, who told him that the payment was part of the resolution of a staffing dispute with EDS. *Id.* at 188 (Rec. 18667). Rozanski testified, however, that when she saw the same invoice several years later, she recognized it as a commitment by Delphi to repay the $20 million "rebate." Doc. No. 316, at 128-29 (Rec. 17220-17221).

In summary, even if, as Free contends, no one ever told him about the side agreement between Delphi's IT department and EDS to repay the $20 million, there were multiple red flags of which Free was aware which reasonably should have alerted him that this payment was not a true rebate. Similar to the Bank One Transaction, Free did not personally undertake a more searching inquiry to verify the validity and true economic purpose of the EDS Transaction. Consequently, the jury could reasonably infer that Free was reckless and, therefore, acted with scienter in accounting for this transaction.

Considering all four transactions together, the jury could have reasonably concluded that Free demonstrated a pattern of shielding himself from the true facts of the transactions by over-reliance on information provided by subordinates and/or by elevating the form of the transaction over the substance. Therefore, there was sufficient evidence to support the jury's determination that Free acted with scienter as to both the Bank One and EDS Transactions. Consequently, Free was not entitled to judgment as a matter of law. For the same reasons, the district court did not abuse its discretion in denying Free's motion for a new trial.

Accordingly, the judgment of the district court is **AFFIRMED.**

12