NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0171n.06

No. 25-5759

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 17, 2026
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| K. PETROLEUM, INC., | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE EASTERN |
| | ) DISTRICT OF KENTUCKY |
| BERNICE HUBACEK, | ) |
| Defendant-Appellant. | ) OPINION |
| | ) |
| | ) |

Before: GIBBONS, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Gas producer K. Petroleum sued landowner Bernice Hubacek

for breach of contract, claiming that Hubacek had interfered with its rightful production of natural

gas from three wells on her property. Hubacek countersued on a maintenance of easement theory,

demanding the company pay the cost of improving the road used to access the wells. The jury

returned a verdict for K. Petroleum, awarding it $108,000 on the breach of contract claim and

rejecting Hubacek's easement claim. The district court denied Hubacek's motion for new trial.

She appeals. We AFFIRM.

I.

Bernice Hubacek moved from New Jersey to a 164-acre farm in a remote part of rural Clay

County, Kentucky in 2019. A prior owner had entered into a lease with K. Petroleum to operate

three natural gas wells on the property. The company's employees visited the wells once per

month to record production and check for safety hazards. Doing so involved the use of a dirt

access road in the back of the farm that the company had used to install the wells.

Hubacek first encountered K. Petroleum's employees shortly after buying the farm. Though she had a vague sense that "[t]here was something about the gas being on the property" when she bought the farm, she did not know the details of the lease. R. 85, Trial Tr., PageID 1354. A series of contentious interactions with K. Petroleum's employees, however, led her to lock the gate and demand that the company notify her before accessing the property. Soon afterward, she informed the company that its employees could not access the wells until they laid down gravel to improve the access road. Although neither party's witnesses could provide specific dates, these events appear to have occurred shortly after Hubacek bought the farm in March 2019.

Eventually, K. Petroleum sent Hubacek a letter in April 2021 demanding that she permit its employees on her land. After doing her own research at the county clerk's office, Hubacek came to the incorrect conclusion that the company did not have a valid lease. She sent a letter to that effect and demanded that the company cease "trespass[ing]." R. 63-9, Ltr., PageID 735. The company responded that it intended to sue her in federal court.

And it did. Hubacek filed an answer and counterclaim. K. Petroleum's motion for partial summary judgment then narrowed the issues at trial: The company sought damages for breach of its lease and, after finding the well valves closed during an attorney inspection, asserted that Hubacek had shut off the wells during the time she had barred K. Petroleum from the property. Hubacek, meanwhile, sought payment for maintenance of the easement, seeking reimbursements for the improvements she made to the access road.

The court held a two-day jury trial. The jury awarded K. Petroleum $108,000 of the $146,714 it sought for lost gas production but awarded Hubacek nothing of the $92,603.66 she sought in reimbursements. Hubacek moved for a new trial. The district court denied the motion. Hubacek now appeals.

## II.

Hubacek challenges the denial of her motion for new trial. "[T]o succeed, [s]he must overcome the substantial deference owed a jury verdict." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). That means, she must show that "the jury reache[d] a seriously erroneous result." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir. 2012) (citation modified). This might be because (1) the verdict was "against the clear weight of the evidence;" (2) the damages were excessive; or (3) the trial was "unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Id.* (citation modified). We review the denial of a motion for a new trial for an abuse of discretion and will reverse the district court only when we have a "definite and firm conviction that the trial court committed a clear error of judgment." *Radvansky*, 496 F.3d at 614 (citation omitted).

## A.

Hubacek first contests the jury's conclusion that she had breached the contract by shutting off K. Petroleum's wells on her property.

Where a motion for new trial attacks the evidence that supports a jury verdict, the issues may superficially resemble a motion for judgment as a matter of law. But a court deciding a new trial motion need not "construe[] [the evidence] in the light most favorable to the non-moving party," as with the "higher showing" required to obtain judgment as a matter of law. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007). To the contrary, the court "may compare the opposing proofs and weigh the evidence." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000) (citation omitted). Still, "the verdict is not unreasonable simply because different inferences and conclusions could have been drawn" or because the court thinks another result "more reasonable." *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 343 (6th Cir. 1993).

The question is whether the verdict was "against the *clear* weight of the evidence." *Static Control*, 697 F.3d at 414 (emphasis added) (citation omitted). The motion must be denied if the jury's verdict "is one which reasonably could have been reached." *Denhof*, 494 F.3d at 543 (citation modified).

Hubacek first highlights the testimony of K. Petroleum's employees relating to whether she had shut off the wells. Justin Collopy, a well tender, testified on cross-examination that in the "three or four times" he had been to Hubacek's farm, "everything [was] working properly" and gas production was not shut off. R. 85, Trial Tr., PageID 1388–89. Harold Frost, a field supervisor, testified that he "d[id]n't recall if [the gas well] was off" or "d[id]n't think it was off" when he first visited Hubacek's farm to check on the leak she reported in April 2019. *Id.* at 1396. He also testified that he visited Hubacek's farm "a little bit before" the attorneys inspected the property in March 2023 but did not indicate whether the wells were shut off at that point. *Id.* at 1401. Finally, Hubacek notes Frost's agreement on cross that "just because a chart is not changed does not necessarily mean that gas is not being produced." R. 86, Trial Tr., PageID 1418.

These quibbles do not unsettle the verdict. Though Collopy never observed the wells being shut off, Frost did. At the March 2023 inspection, accompanied by each party's attorneys, he found all three wells shut off. Junior Hill, who "check[s] gas wells and compressors" for K. Petroleum, testified to the same. R. 85, Trial Tr., PageID 1370, 1373. And so did Jam Khorrami, the founder of K. Petroleum. Khorrami also testified that "pipeline pressures" from downstream portions of the system and other unnamed "indications" had alerted the company that "the wells [were] shut-in" on Hubacek's property well before the March 2023 inspection, *id.* at 1308, though he later appeared to recant this testimony, *see id.* at 1326. That Frost did not check the wells during the pre-inspection visit in 2023 does not undermine this testimony. Neither does Frost's testimony

that he "d[id]n't recall" or "d[id]n't think" that the well was off during his first visit around April 2019; that visit occurred before Hubacek barred the company's employees from accessing the property. *Id.* at 1396. Finally, it is true that K. Petroleum lacks concrete evidence showing the production or non-production of the wells during time in question. But that does not guarantee Hubacek an inference that the charts would have shown production, particularly given the fact that Hubacek barred K. Petroleum from checking the charts during that time.

Hubacek also argues that various pieces of documentary evidence undermine K. Petroleum's proof that she shut off the wells. She points to incongruities in three documents (Joint Exhibits 3, 27, and 37) presented at trial to show historical production figures. Each source includes a mixture of actual production records gleaned from monthly visits to well meters and estimated production figures for months in which K. Petroleum did not check the meters. As a policy, K. Petroleum pays royalties to a landowner based on estimated production, even when it is unable to verify or measure monthly gas quantities, to prevent a landowner from arguing that the company had abandoned its lease.

Hubacek makes much of the incongruity among these three records of production. For instance, she observes that in September 2020, the three exhibits indicate three different values for the amount produced by one of the wells on her property: Exhibit 3 shows 13.09 MCF (thousand cubic feet) produced; Exhibit 27 shows 87.26 MCF; and Exhibit 37 shows 120 MCF. But as K. Petroleum points out, the discrepancy between Exhibits 3 and 27 is easily explainable. The lease provides for a 15% royalty to the landowner on that well's production; and 15% of the 87.26 MCF figure in Exhibit 27 rounds to the precise 13.09 MCF figure in Exhibit 3. And the same holds for the figures for other months and other wells in those documents, given the 12.5% royalty rate applicable to them. Still, K. Petroleum offers no explanation for the discrepancy between the

estimated figures in its historic production records, Exhibit 37, and those in the owner disbursement figures or checks, Exhibits 3 and 27. When asked about differences in the estimates, Khorrami could say little more than that he "ha[d] no idea where these numbers came from exactly" as "[a]ccounting does this" and "I do not do the accounting." R. 85, Trial Tr., PageID 1328.

Hubacek also points to the fact that Exhibit 37 shows that K. Petroleum relied on estimated production figures during periods before Hubacek bought the property, suggesting that the company did not check the wells during those periods either. Finally, Hubacek points to letters from K. Petroleum in the period leading up to litigation, which raised only her refusal to allow employees to access the wells and did not allege that she had shut off the wells.

Although the evidence is not uniformly helpful to K. Petroleum, it permits the inference that Hubacek shut off the wells on her property. To be sure, the fact that K. Petroleum was unable to access the wells to record production figures does not demand the conclusion that the wells were shut off during that period. Instead, that conclusion flows from the observation that the wells were shut off during the attorney inspection in March 2023, after K. Petroleum had been unable to access the wells in years. Both (1) Frost's testimony that the wells were producing in April of 2019 when he checked on Hubacek's report of a leak, and (2) the record in Exhibit 37 of measured production in the five months immediately preceding Hubacek's taking possession of the property bolster the inference. That K. Petroleum used inconsistent methods to estimate production does not change this conclusion. Indeed, even if the wells had been shut off by another individual just prior to Hubacek's taking possession, her refusal to permit K. Petroleum to access the property and restore flow would still have breached the lease and caused the lack of gas production.

Finally, it is true that the letters sent before litigation began are in some tension with K. Petroleum's contention that it was aware of nonproduction before the March 2023 inspection. And, to be sure, Khorrami's own testimony is inconsistent on that point. But K. Petroleum appears to have abandoned reliance on that view, and it is not necessary to support the verdict.

In all, we are unable to say that the verdict on this point was against the clear weight of this evidence, much less that the district court abused its discretion in denying the motion for new trial on this ground.

B.

Next, Hubacek targets the jury's award of damages. A district judge may not award a new trial on damages unless they "exceed[] the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss," *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 424–25 (6th Cir. 1999) (citation modified), or are "so large such that [they] shock[] the judicial conscience and work[] a denial of justice," *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 362 (6th Cir. 2005) (quoting *Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1109 (6th Cir. 1984)).

At trial, K. Petroleum's case for damages rested on the testimony of expert Wes Casto, who estimated the lost profits that resulted from Hubacek's interference with gas production. Hubacek criticizes this proof along four avenues.

First, she targets Casto's estimates of monthly production. Those estimates were based on the average gas flow in the first month K. Petroleum resumed production in 2023 and appeared to be significantly higher than trends shown by K. Petroleum's documentary evidence of historic production from the wells. Although Hubacek's calculations are not entirely correct, it does appear true that measured production after flow resumed was markedly higher than it had been previously.

Indeed, it was approximately double what it had been in the five months of recorded production in 2018–19, immediately before Hubacek took possession of the property, and 2.4 times what it had been in 2015, the last full year of recorded production. *See* R. 63-19, Casto Report, PageID 754.

But Casto explained this choice at trial: the available past production figures were "more than four years old," so they were not the "more accurate and relevant indicator of the wells' ability to produce." R. 86, Trial Tr., PageID 1435–36, 1440. We cannot say that the jury acted unreasonably to the extent that it accepted these figures. And the district court concluded that the jury "[u]ndoubtedly . . . factored in at least some of" the criticisms of "Casto's methodology," given the 26% gap between K. Petroleum's sought damages and the award. R. 79, Op. & Order, PageID 1014. We cannot say that the district court abused its discretion in concluding that the jury "reached a reasonable verdict as to the damages." *Id.*

Second, Hubacek argues that Casto erroneously failed to deduct certain operating expenses from calculated profits. Casto deducted severance tax and the 12.5%–15% royalty rates due to Hubacek from his calculation of profits, but did not consider any other operating expenses. Casto explained this choice by reference to (1) the size of K. Petroleum's operation in Kentucky, concluding that the overhead costs would not have increased if the company had been able to operate these wells, and (2) the very fact that it "wasn't able to operate the wells normally" when Hubacek barred the company from her land. R. 86, Trial Tr., PageID 1446. Neither of these rationales is reassuring. As Casto himself admitted on re-direct, though "operating expenses will [usually] be estimated at the field level" and the "estimate per well . . . [is] not usually an exact number," those expenses are a relevant portion of a profit calculation. *Id.* at 1447. And K. Petroleum's actual inability to operate the well is irrelevant to the "profits that [it] would have made, *but for* the conduct of the Defendant." R. 70, Jury Instr., PageID 943 (emphasis added).

Nonetheless Hubacek made these points on cross-examination and, as above, the jury's substantial reduction to Casto's proposed damages figure reassures us that the district court did not abuse its discretion by denying the motion for new trial.

Third, Hubacek argues that Casto erred in using the Ohio Department of Taxation's published interest rates rather than those applicable under Kentucky law when calculating prejudgment interest on K. Petroleum's damages. "There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law." *L-S Indus., Inc. v. Matlack*, 448 F. App'x 597, 598 (6th Cir. 2012) (quoting *Daily v. Gusto Recs., Inc.*, 14 F. App'x 579, 591 (6th Cir. 2001)). But, as the district court noted, Hubacek "did not object to the use of this interest rate, offer a competing rate, or explain how this interest rate would impact the losses claimed by Plaintiff." R. 79, Op. & Order, PageID 1011. Hubacek's appellate briefing does no better. *See* Appellant Br. at 15. When a party "mention[s] a possible argument in the most skeletal way," "adverts to [it] in a perfunctory manner," or makes no "effort at developed argumentation, we consider [it] forfeited." *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022). So this issue is forfeited twice over.

Fourth, Hubacek argues that Casto employed the wrong approach to determining lost profits. Instead of estimating monthly production and determining lost sales during the months in question, Hubacek would have had Casto determine the difference between a sale at the time of loss (2019–22) and the time that production resumed (March 2023). But that approach is inappropriate where, as Khorrami testified, K. Petroleum operates under contracts that restrict its sale volume. Thus, the backlog of unsold gas cannot be simply unloaded in one transaction once production resumes.

Whatever might be said of Casto's testimony on damages, the jury did not step beyond the bounds of reasonable inferences from the evidence available to it, nor did the district court err in denying the motion for new trial.

C.

Finally, Hubacek attacks the jury's rejection of her maintenance of easement counterclaim. Here again, we ask whether the district court abused its discretion in concluding that the verdict was not "against the clear weight of the evidence." *Static Control*, 697 F.3d at 414 (citation omitted). Consistent with Kentucky law, the jury was instructed that

> Where an easement is jointly used by a natural gas production company and landowner, the cost to maintain the easement must be equitably divided, but not necessarily equally divided. The cost of any repairs or maintenance must be reasonable and the landowner is not given a "blank check" to make whatever changes, repairs, or upgrades to the easement that they desire.

R. 70, Jury Instr., PageID 945; *see Baker v. Hines*, 406 S.W.3d 21, 30–31 (Ky. App. 2013). Hubacek does not challenge these instructions. Instead, she argues that the jury ignored the instruction when it awarded her $0 on the counterclaim. Doing so, she contends, amounted to an erroneous conclusion that K. Petroleum "did not have to share in the maintenance of the easement" and that its contribution was "optional" rather than "mandatory." Appellant Br. at 21, 24.

We disagree. As the district court noted, ample evidence at trial supported the jury's decision under Kentucky's equitable standard. K. Petroleum's desired use of the access road was limited to 30 minutes to one hour once per month when checking on the wells. By Hubacek's own admission, that use did no harm other than to "damage the grass," R. 85, Trial Tr., PageID 1368–69, which was already grazed on by her livestock. Hubacek's desired improvement, converting the dirt track access road into a gravel road, appears to have been unnecessary for K. Petroleum's

use of the easement. And when K. Petroleum refused to pay for Hubacek's purchase of gravel, she barred its employees from accessing the wells.

After denying K. Petroleum the use of the easement, Hubacek sought damages for her improvements. She wanted $1,048.69 for gravel laid down on the road, another $1,253.60 for drainpipe and culvert tiles, $727.97 for an ATV-drawn gravel rake, $40,477 for a backhoe, $29,500 for an excavator, and $20,000 for a miniature excavator. Hubacek claimed that nearly all of these items were used exclusively for the maintenance of the access road. The jury did not agree. Neither did the district court. And we conclude that neither erred in finding that K. Petroleum was not equitably obligated to cover these costs in these circumstances.

\* \* \*

We AFFIRM.