RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SHERYL HUBBELL,

         *Plaintiff-Appellee/Cross-Appellant*,

    *v.*

FEDEX SMARTPOST, INC.,

         *Defendant-Appellant/Cross-Appellee*.

Nos. 18-1373/1727

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-13897—George Caram Steeh, III, District Judge.

Argued: January 16, 2019

Decided and Filed: August 5, 2019

Before: BOGGS, KETHLEDGE, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, for Appellant/Cross-Appellee. Raymond Guzall III, Farmington Hills, Michigan, for Appellee/Cross-Appellant. **ON BRIEF:** John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, for Appellant/Cross-Appellee. Raymond Guzall III, Farmington Hills, Michigan, for Appellee/Cross-Appellant. Anne Noel Occhialino, Susan R. Oxford, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

───────────────

## OPINION

───────────────

JANE B. STRANCH, Circuit Judge. Sheryl Hubbell worked for Defendant FedEx SmartPost, Inc. ("FedEx") as a parcel sorter in Belleville, Michigan. She alleges that her

manager told her she should accept a demotion because "females are better suited to administrative roles and males are better suited to leadership roles," repeatedly disciplined her, then eventually demoted her from her position as lead parcel sorter based on her sex. She also alleges that FedEx retaliated against her for filing complaints with the Equal Employment Opportunity Commission (EEOC) and for filing a lawsuit by unfairly disciplining her, not allowing her to earn extra pay by clocking in early or clocking out late, and closely surveilling her. Eventually, she was fired.

FedEx appeals from the jury verdict finding in favor of Hubbell on her Title VII retaliation claim. Hubbell cross-appeals the reduction of her attorney's fees from the requested amount. Because sufficient evidence supported the jury's verdict on both liability and punitive damages, and because the district court did not abuse its discretion in granting Hubbell attorney's fees but reducing the amount, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Evidence of Retaliation at Trial

#### 1. Hubbell's testimony

Sheryl Hubbell worked for FedEx in Belleville, Michigan from September 2006 to December 2014. She was hired as a part-time parcel assistant in 2006 and promoted to a full-time parcel sorter in 2007. In 2010, she was promoted to lead parcel sorter, a non-management position that involved some supervisory responsibilities.

In February or March of 2011, Todd Treman took over as Hubbell's "hub manager." In August 2011, Treman suggested in a one-on-one meeting that Hubbell demote herself to an administrative role because he felt "that females are better suited to administrative roles and males are better suited to leadership roles." Then, in January 2012, Treman suggested again that Hubbell demote herself. He told her that she should "take the demotion, and if [she] didn't, things would continue to get harder for [her]." Hubbell responded that she did not want to be demoted. Before this meeting, Hubbell had never been subject to disciplinary action and had received several awards and certificates for her performance from 2007 to 2010.

After this meeting, Hubbell's supervisors took several actions that made her job harder. Low-performing parcel sorters were placed in Hubbell's area or the area of other female lead parcel sorters, making the female leads look bad. She was also not given enough workers. Starting in the peak season of 2011, Hubbell was given multiple, conflicting work assignments by her direct supervisors, then criticized for failing to complete all of them effectively; so were other female lead parcel sorters. She received her first written discipline in July 2012, then another in September 2012; she contested the factual basis for both. She also received a poor performance review for fiscal year 2012; she contested the factual basis for this performance review as well.

Hubbell sent an email to the managing director of Human Resources about this performance review and Treman's comment that he thought women were not suited for leadership or management roles. Guy Larsen, a senior manager from Human Resources, was sent to meet with Hubbell in response to her complaint. She told Larsen that Treman was discriminating against her because he "did not want females in management." Larsen responded that he preferred the term "favoritism" to "discrimination" because "discrimination" was an "inflammatory word." Rather than addressing Hubbell's concerns about discrimination, Larsen told her that "maybe [she] just had a bad review, and to keep [her] head down, and let the managers do their job."

Despite complaining to Human Resources, Hubbell continued to have trouble at work following the negative performance review and to be subject to disciplinary actions that she believed to be unwarranted. Eventually, on August 28, 2013, she was demoted to parcel sorter on the ground that she was not a competent leader.

On November 7, 2013, Hubbell filed a sex-discrimination and retaliation complaint with the Equal Employment Opportunity Commission (EEOC). After she filed this complaint, she was "watched more closely by management. [Her] daily actions, [and her] work routine was scrutinized. [She] experienced write up after write up after write up." She disputed the validity of various disciplinary actions she had received. In addition, at some point after she was demoted, she was told that she could not clock in more than three minutes early—other workers

could clock in up to 15 minutes early and would receive extra pay as a result—and that she could not work more than eight hours in a day.

On March 10, 2014, Hubbell filed a second complaint with the EEOC, alleging retaliation. She testified that after she filed this second complaint, she experienced further retaliation. Her managers instructed security guards to monitor how long she was taking on her bathroom breaks although she had not had any issues with her bathroom breaks previously. She was disciplined for four purportedly unexcused absences even though she provided doctor's notes excusing these absences and was on medical leave. She was told by managers to remove her tinted safety glasses, which an ophthalmologist had directed her to wear. Managers monitored Hubbell's conversations with other workers while she was on break. They would ask the other employees what they had talked about. A manager asked her to approve changes to her timesheet that would make it look like she had clocked in for work at 11:09—making her late— when she had in fact clocked in at 11:03. In 2014, for the first time since she started working at FedEx, Hubbell was not given extra hours during "peak time." She received disciplinary writeups for leaving early when other workers left early without being subject to disciplinary action, or when she had cleared leaving with her supervisors in compliance with company policy. Finally, in December 2014, Hubbell was fired, supposedly because she had left work early. Hubbell had received no disciplinary writeups prior to Treman becoming the hub manager, and 15 or 16 disciplinary actions in total after he became the manager.

Hubbell filed suit against FedEx in October 2014, shortly before she was fired. Subsequently, in February 2015, she filed a third and final complaint with the EEOC, alleging that she was fired in retaliation for filing this lawsuit.

### 2. Other FedEx employees' testimony

Alphonse Reed was a part-time shipping and receiving employee at FedEx from 2008 to 2014. He testified that he witnessed Hubbell receive less help than other employees when she was lead parcel sorter. He also testified that sometimes Hubbell could not speak to him while they were at work because she was always being watched. Management started watching her in

June or August of 2013. He was allowed to talk to other employees, just not Hubbell. Management treated her "[l]ike a dog." She was treated worse than any other employee.

James Massie, Jr. worked as a security guard at the FedEx location in Belleville for about two years, leaving in December 2013. After Hubbell was demoted, management started a log to record when employees took bathroom breaks. Massie was told to keep track of how long Hubbell took on her bathroom breaks; she was the only employee he was told to watch. He was also told not to let Hubbell clock in early with the other full-time employees; she had to wait with the part-time employees. This started three or four months before he left in December 2013. During the time he worked there, Massie never saw management treat another employee as badly as Hubbell.

### 3. Evidence that FedEx knew of Hubbell's complaints

Hubbell put FedEx on notice a number of times that she had filed an EEOC complaint. After she was demoted, she told manager Bill Mullins that she was considering filing a complaint for discrimination outside of FedEx; then, in March 2014, she told him that she had filed an EEOC complaint. She told manager John Molnar before filing her first EEOC complaint that "if things didn't change," she would "escalate the situation out of FedEx, that [she] would make the complaint outside of the company, meaning the EEOC." She told manager Lauren Fishwick on January 31, 2014 that she had filed an EEOC complaint; Fishwick relayed this information to Human Resources via an email. And Hubbell wrote at the bottom of several disciplinary actions she received later in 2014 that she was being disciplined in retaliation for her EEOC complaint(s).

There is little evidence, however, that any of these managers knew that Hubbell had filed a lawsuit. Hubbell herself did not testify that she had directly informed anyone at FedEx of her lawsuit. And Treman testified that he did not learn that Hubbell had filed a lawsuit until January or February 2015, after he had fired her. The closest thing to evidence of knowledge was manager Clay Jensen's testimony on cross-examination that he did not remember whether he had made a comment to another employee about Hubbell filing a lawsuit before she was fired,

although it did not "sound like something that [he] would say," and that he did not remember when he learned that she had filed suit.

### 4. FedEx's anti-discrimination policy

Several of Hubbell's managers testified that FedEx had an anti-discrimination policy and that they had been trained on this policy. Jessica Benjamins, FedEx's corporate Human Resources manager, also testified as to FedEx's anti-discrimination policy. She testified that FedEx conducts annual online "diversity inclusion training" for managers. And she testified that it has long been FedEx's policy not to discriminate. But FedEx only promulgated a specific policy on non-discriminatory hiring and promotion on November 26, 2013—after Hubbell was demoted and filed her first EEOC complaint.

Benjamins further testified that if an employee had made a complaint to her of gender discrimination, she would open an investigation. But she had not seen a report of any investigation by Human Resources or anyone else into Hubbell's reports of discrimination and discrimination. She does not know why a complaint was not opened because she "was not involved." It was her colleague Guy Larsen's job to investigate this case. She would have opened a complaint into Hubbell's allegations. She did not know if FedEx followed its own policies in this instance.

FedEx argues that Larsen filed an investigative report form in response to a complaint from Hubbell. But this investigation pertained only to one of Hubbell's subordinates who had approached her overly aggressively while she was still working as lead parcel sorter. The investigative report form notes that Larsen was "visiting with Ms. Hubbell tied to a separate concern that she had with her performance review," but it does not provide any additional information about this concern. Nor does this form note any allegation of or investigation into sex discrimination.

**B. Procedural History**

1. Pretrial proceedings

Hubbell's amended complaint contains four claims: (1) gender discrimination; (2) retaliation for filing EEOC complaints; (3) hostile work environment; and (4) retaliation for filing suit. FedEx moved for summary judgment on all claims. The district court granted this motion as to the hostile-work-environment claim but denied it as to the other claims. Notably, however, the court concluded that "Hubbell's disciplinary write-ups [did] not constitute materially adverse actions" sufficient to make out a prima facie case of retaliation under Title VII. "Similarly, FedEx's intense monitoring of Hubbell and most of FedEx's other alleged acts of harassment did not result in a material harm to Hubbell." According to the court, only "FedEx's alleged refusal to allow Hubbell to clock in and out at the same time as her fellow employees . . . constituted a materially adverse action" sufficient to support a claim of retaliation for filing an EEOC complaint.

After the district court decided the summary-judgment motion, FedEx removed a parallel state-court suit Hubbell had filed to federal court on the basis of diversity jurisdiction. The district court denied Hubbell's motion to remand her state-court complaint, then consolidated the state-law claims with the federal claims in a single case.

2. Jury instructions, verdict form, and deliberations

When this case went to trial, the court charged the jury on two counts, one of gender discrimination and one of retaliation. The jury instructions made no distinction between state and federal law as to either claim. Nor did the instructions distinguish between the claim of retaliation for filing the EEOC complaint and the claim of retaliation for filing a lawsuit. The charge on retaliation stated that there were four elements to this claim: (a) Hubbell "filed a complaint;" (b) that was known to FedEx; (c) "FedEx took an employment action adverse to . . . Hubbell; and" (d) "there was a causal connection between the protected activity and the adverse employment action." But the jury instructions also noted that "the parties agree that the first three elements are not in dispute. Therefore, the only element for [the jury] to decide . . . is

whether a causal connection existed between the protected activity and the adverse employment action." The jury instructions did not define the term "adverse employment action."

The verdict form asked the jury 11 questions. The first question dealt with the discrimination claim. The second question dealt with the retaliation claim: it asked whether Hubbell had proved by a preponderance of the evidence that FedEx "took adverse employment action against [her] because she complained of gender discrimination to . . . FedEx's Human Resources department; filed an EEOC charge complaining about gender discrimination; or filed a lawsuit." The third through eighth questions dealt with the calculation of damages. The ninth question asked whether Hubbell had shown that FedEx "engaged in discrimination or retaliatory practice with malice or reckless indifference to [her] federally protected rights." If the jury answered "yes" to this question, they were to proceed to the tenth question—whether FedEx had "shown that it made a good-faith effort to comply with the law prohibiting gender discrimination." Finally, if and only if the jury answered "no" to the tenth question, the jury was asked to determine one final question: "[w]hat amount, if any," it would award Hubbell for punitive damages.

The jury initially returned an inconsistent verdict, checking off that FedEx had acted in good faith but nonetheless awarding Hubbell punitive damages. FedEx argued that once the jury answered "yes to question 10"—whether FedEx acted in good faith—the jury's award of punitive damages became "irrelevant under the law, and so . . . the verdict can be accepted." Hubbell argued that "the intent of the jury was to . . . award punitive damages" but, because the jury verdict form indicated they were confused as to the law, a curative instruction was warranted. Over FedEx's objection, the court decided to explain to the jury that its verdict was inconsistent and send it back to deliberate.

The district court told the jury that it had "received your completed verdict form, and there's a problem that we're going [to] have you correct." The court reminded the jury that the verdict form instructed that if "you answered yes to Question Number 10, the foreperson should sign the verdict form and return it . . . without completing an amount of punitive damages." After further deliberations, the jury crossed out its finding that FedEx acted in good faith and

kept the award of punitive damages. The jury awarded Hubbell $85,600 in combined front and back pay, $30,000 in "non-economic damages," and $403,950 in punitive damages.

### 3. Post-trial motions

FedEx first moved for judgment as a matter of law under Federal Rule of Civil Procedure 50 after Hubbell rested. After this motion was denied, FedEx renewed its Rule 50 motion at the close of evidence, then subsequently briefed the issue. FedEx made essentially the same arguments in support of judgment as a matter of law as it makes on appeal. FedEx also argued that it was entitled to a new trial based on faulty jury instructions because punitive damages are not allowed under Michigan's Elliot-Larsen Civil Rights Act and total damages under Title VII are capped at $300,000; in the alternative, accounting for compensatory damages, it argued that the punitive damages should be reduced to $216,500. The district court granted in part and denied in part FedEx's motion, (a) holding that Hubbell had presented sufficient evidence for the jury to find in her favor on retaliation and punitive damages, (b) denying FedEx a new trial, and (c) reducing the amount of the punitive-damages award to $300,000.[1]

Hubbell filed a motion seeking attorney's fees and costs after the jury verdict. FedEx initially opposed this motion on the ground that it would be filing motions for a new trial and judgment as a matter of law, but never opposed the specific fees requested. Nonetheless, the district court granted the motion for attorney's fees but reduced the hourly rate requested by lead counsel as well as the number of hours billed by both lead counsel and co-counsel. Hubbell filed a motion for reconsideration, but the court denied this motion because she did not raise any new arguments or demonstrate "a palpable defect" in the court's award of attorney's fees.

---

[1]The district court reduced the amount of punitive damages to $300,000 rather than $216,500 because front and back pay are excluded from Title VII's cap on damages, *see Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 820 (6th Cir. 2016), and the non-economic damages were allocated to Hubbell under state rather than federal law, *see Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007). FedEx does not challenge on appeal the reduction of punitive damages to $300,000 rather than $216,500.

## II. ANALYSIS

### A. The Retaliation Claim

FedEx argues that it was entitled to judgment as a matter of law on Hubbell's retaliation claims because: (a) the district court held on summary judgment that the only alleged act of retaliation that was sufficiently materially adverse to support a Title VII retaliation claim was not allowing Hubbell to clock in early or out late; (b) the evidence at trial showed that this began when Hubbell was demoted, over two months before she filed her first EEOC complaint; and (c) the evidence at trial showed that Hubbell's managers did not know of her lawsuit before firing her. Hubbell responds that, notwithstanding the prior summary-judgment ruling, she was allowed to and did present at trial sufficient evidence of retaliation to support the jury's verdict. The EEOC also submitted an amicus brief supporting affirmance, arguing that the district court had misstated the standard for a Title VII retaliation claim and that FedEx erred in relying on this incorrect statement of the law in arguing for reversal.

"We review *de novo* a district court's decision to deny a renewed motion for judgment as a matter of law under Rule 50(b)." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1065 (6th Cir. 2015) (citing *Radvansky v. City of Olmsted*, 496 F.3d 609, 614 (6th Cir. 2007)). But, for FedEx to succeed on its challenge, it must "overcome the substantial deference owed a jury verdict." *Radvansky*, 496 F.3d at 614. Thus, like the district court, "we may grant the [Rule 50] motion 'only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury and reasonable minds could come to but one conclusion, in favor of the moving party.'" *New Breed Logistics*, 783 F.3d at 1065 (quoting *Radvansky*, 496 F.3d at 614). In making this determination, "this court 'may not weigh the evidence, pass on the credibility of witnesses, or substitute [our] judgment for that of the jury.'" *Id.* (alteration in original) (quoting *Spengler v. Worthington Cylinders*, 615 F.3d 481, 489 (6th Cir. 2010)).

Under Title VII, a plaintiff must establish four elements for a prima facie claim of retaliation: "(1) she engaged in a protected activity; (2) her 'exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially

adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'" *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant "to proffer some legitimate, nonretaliatory reasons for its actions." *New Breed Logistics*, 783 F.3d at 1066 (citations omitted). If the defendant does so, the burden of persuasion then shifts back to the plaintiff "to show that the proffered reasons were not the true reasons for the employment decision, *i.e.*, that the reasons were a pretext for retaliation." *Id.* (citations omitted).[2]

As to the first prong, FedEx does not dispute that filing an EEOC complaint or filing a lawsuit are protected activities under Title VII. Nor could it. *See, e.g.*, *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (EEOC complaint).

As to the second prong, FedEx also does not dispute that its managers were aware that Hubbell filed an EEOC complaint but does argue that they did not become aware she had filed a lawsuit until after she was fired. FedEx is correct that Hubbell failed to carry her burden at trial as to knowledge of the lawsuit because there was no evidence that any of her managers learned of her suit before she was fired. To the contrary, Treman testified that he only became aware of the lawsuit after he fired Hubbell and Clay Jensen testified that he did not remember when he learned that she had filed a lawsuit. Although Hubbell argues that the question of whether to believe Jensen's testimony should be left to the jury, Jensen's statement that he did not remember when he learned that Hubbell filed suit is simply not enough to carry her burden of showing knowledge.

As to the third and fourth prongs, FedEx relies on the trial court's summary-judgment opinion, as well as pre-2006 caselaw from this circuit, for the proposition that "FedEx's alleged 'refusal to allow Hubbell to clock in and out at the same time as her fellow employees' was the *only* possible adverse action that could support her retaliation claim based on the first-filed

---

[2]We analyze Hubbell's claim under Title VII only and not state law because the parties and district court consistently treated state and federal law as being functionally equivalent—other than the unavailability of punitive damages under Michigan's Elliott-Larsen Civil Rights Act. Moreover, the two statutes have similar, though not identical, requirements. *See Moore*, 171 F.3d at 1080.

EEOC claim." FedEx asserts that this means that Hubbell did not establish causation because this action began around the time she was demoted, months before she filed her first EEOC complaint. FedEx's support for this position, however, is based on its reliance on outdated cases as to what constitutes a materially adverse action sufficient to support a Title VII retaliation claim.

As the EEOC points out, the district court erred in relying on our pre-2006 precedent regarding materially adverse employment actions. Although we had previously held that the same requirements apply to Title VII retaliation claims and Title VII discrimination claims,[3] the Supreme Court made clear in *Burlington Northern* that the requirements for a retaliation claim are in fact considerably less stringent. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–69 (2006) (rejecting the Sixth Circuit's contrary view). The Court concluded that "Title VII's substantive [antidiscrimination] provision and its antiretaliation provision are not coterminous." *Id.* at 67. A plaintiff alleging discrimination has to show conduct that "affect[s] the terms and conditions of employment." *Id.* at 64. But a plaintiff seeking Title VII's protection against retaliation need show only "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations and internal quotation marks omitted). We recently addressed this now decade-old distinction, reiterating that the showing required for a Title VII retaliation claim "is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Rogers*, 897 F.3d at 775–76.

Viewed under the correct standard, a reasonable factfinder could find that a number of the actions Hubbell testified about would be sufficient, on their own or in combination, to dissuade a reasonable worker from filing or pursuing an EEOC complaint. For example, both Hubbell and other FedEx employees testified that she was placed under close surveillance. Specifically, security guard James Massie, Jr., testified that Hubbell was the only employee

---

[3]*See, e.g.*, *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (2002); *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999). The district court also cited an unpublished 2013 case, *Choulagh v. Holder*, 528 F. App'x 432 (6th Cir. 2013), for the standard governing Title VII retaliation claims. But *Choulagh*, in turn, relies on this circuit's pre-2006 cases on this point. *See id.* at 437–39 (citing *Hollins*). To the extent that these cases conflict with *Burlington Northern* as to what constitutes a materially adverse action for purposes of a Title VII retaliation claim, they are no longer good law.

whose comings and goings to the bathroom he was told to track. And Alphonse Reed testified that Hubbell was the only fellow employee he could not talk to because managers were constantly watching her. The evidence at trial also revealed that after Treman became her hub manager, Hubbell was subject to numerous disciplinary writeups, which she claimed were unjustified and ultimately led to her termination. Although there was some dispute at trial, the evidence showed that Hubbell was written up for unexcused absences even when she provided doctor's notes excusing these absences. Each of these actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. Indeed, even before *Burlington* clarified the standard applicable to Title VII retaliation claims, we had held that "more frequent disciplinary writeups of plaintiff for trivial matters and unwarranted criticism of plaintiff's work" were sufficient, "[w]hen viewed as a whole," to "support the jury's finding that defendants retaliated against plaintiff." *Moore*, 171 F.3d at 1080. Similarly, we have upheld a finding of retaliation where the record showed that "the plaintiff's activities were scrutinized more carefully than those of comparably situated employees, . . . and that the defendants took every opportunity to make his life as an employee unpleasant." *Harrison v. Metro. Gov't of Nashville & Davidson Cty.*, 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled on other grounds as recognized by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n.6 (6th Cir. 1999).

A reasonable factfinder could also find that some or all these acts were taken in retaliation for Hubbell's EEOC complaint(s). Trial evidence revealed that Hubbell was repeatedly disciplined within a year of filing her EEOC complaints, starting with three disciplinary writeups within approximately two months of filing her first EEOC complaint—the first one coming a mere four days after she filed her complaint. Such close temporal proximity, standing alone, may be enough to prove causation. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008) (holding that close temporal proximity alone can be enough to establish a causal connection for a prima facie case). But it is not the only evidence of causation. Here, as in *New Breed Logistics*, the plaintiff also "submitted evidence sufficient for the jury to reject [the defendant's] legitimate, nonretaliatory reasons" for its actions as pretextual. 783 F.3d at 1070. Hubbell presented testimony from fellow employees that she was singled out for adverse treatment and presented undisputed evidence, such as doctor's notes excusing her

absences, that at least some of her disciplinary writeups were unjustified. On this record, the jury could have reasonably inferred that retaliation for filing an EEOC complaint was a but-for cause of the materially adverse actions Hubbell suffered. *See id.* at 1070–71.

FedEx's primary counterargument is that, regardless of whether the district court's summary-judgment ruling was correct as a matter of law, "Hubbell's claims at trial *were* cabined by the district court's summary-judgment ruling." In other words, because the district court ruled that disciplinary writeups and intense monitoring did not rise to the level of materially adverse actions supporting a retaliation claim, she cannot now rely on these acts as evidence of retaliation to support the jury's findings. But FedEx does not provide any authority for its position that appellate review of the sufficiency of the evidence for a jury's verdict is limited by the district court's mistake of law on summary judgment as to "what actions constituted actionable retaliation." Our review is not so limited. *Cf. K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174 (6th Cir. 1996) (stating that when a defendant loses on summary judgment and then on a Rule 50 motion, this court will review only the denial of the Rule 50 motion).

Instead, we are duty-bound to apply governing precedent and "may affirm on any ground supported by the law and the record." *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018). A court may grant a Rule 50 motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *New Breed Logistics*, 783 F.3d at 1065 (quoting *Radvansky*, 496 F.3d at 614). It is hardly viewing the evidence in the light most favorable to Hubbell to accept a legally incorrect definition of what constitutes a "materially adverse action." Rather, in determining whether there was sufficient evidence for the jury's verdict, we must apply the correct legal standard to the evidence at trial.

FedEx also argues that application of the governing legal standard for a Title VII retaliation claim "is waived" because it was first put forth by the EEOC in its amicus brief and Hubbell failed to argue it. Issues may be waived; application of a legal standard may not. *See Moritz v. Lafler*, 525 F. App'x 277, 285 (6th Cir. 2013) ("[A] party cannot waive the proper standard of review by failing to argue it." (quoting *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008))).

Because, viewed under the proper legal standard, there was enough evidence for a reasonable factfinder to find for Hubbell on her retaliation claim, we affirm the district court's denial of FedEx's Rule 50 motion for judgment as a matter of law as to liability.

**B. Punitive Damages**

FedEx argues in the alternative that, even if it is not entitled to judgment as a matter of law on liability, it is so entitled on punitive damages. First, it argues that "[t]here was insufficient evidence of egregious FedEx conduct to warrant an award of punitive damages." Next, it argues that it is entitled to judgment or a new trial because the jury initially both awarded Hubbell punitive damages and found that FedEx acted in good faith, which would preclude punitive damages. Hubbell responds that there was sufficient evidence for an award of punitive damages and that the trial court did not err in instructing the jury that it had returned an inconsistent verdict and telling it to return to deliberate. The EEOC notes in its amicus brief that FedEx again misstates the legal standard, this time by claiming that proof of egregious conduct is required for an award of punitive damages when it is not.

The Supreme Court set out a three-part test for determining when punitive damages can be recovered in *Kolstad v. American Dental Association*, 527 U.S. 526 (1999). "First, a plaintiff must 'demonstrate that the individuals perpetrating the discrimination acted with malice or reckless indifference toward the plaintiff's federally protected rights.' A plaintiff satisfies this prong by demonstrating the individual in question acted 'in the face of a perceived risk that its actions will violate federal law.'" *New Breed Logistics*, 783 F.3d at 1072 (alterations omitted) (quoting *Kolstad*, 527 U.S. at 534). Second, a plaintiff must "demonstrate[] that the employer is liable by establishing that the discriminatory actor worked in a managerial capacity and acted within the scope of his employment. Third, the defendant may avoid punitive-damages liability by showing that it engaged in good-faith efforts to comply with Title VII." *Id.* (citing *Kolstad*, 527 U.S. at 539–41, 544–46).

FedEx's opening brief relies on an unpublished district court case to suggest that punitive damages can only be sustained in cases involving egregious conduct. Indeed, its heading argues that punitive damages were unwarranted because "[t]here was insufficient evidence of egregious

FedEx conduct," and it repeatedly refers to this supposed gap in the record. But, as the EEOC points out, the Supreme Court has rejected the argument that punitive damages "require a showing of egregious or outrageous discrimination independent of the employer's state of mind." *Kolstad*, 527 U.S. at 535. Instead, although "evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to 'demonstrate' that the employer acted with the requisite 'malice or reckless indifference,'" evidence of egregiousness is not required. *Id.* at 539 (alterations omitted) (quoting 42 U.S.C. § 1981a(b)(1)). Characterizing the EEOC's correction as a "quibble[]," FedEx concedes this point of law on reply but nevertheless insists that "Hubbell's claim for punitive damages does not satisfy the *Kolstad* standard either."

FedEx also suggests that this inquiry focuses on the actions of the employer, stating that the first prong of *Kolstad* is whether "the defendant acted with malice or reckless disregard toward the plaintiff's federal rights." It then focuses on FedEx's "implementation, promulgation, and training regarding anti-discrimination policies." This again misstates the law. *Kolstad* requires "a showing of the requisite malice or reckless indifference on the part of certain individuals," not the employer itself. 527 U.S. at 539 (alterations omitted); *accord New Breed Logistics*, 783 F.3d at 1072. An employer can be held vicariously liable for punitive damages if its employee "was employed in a managerial capacity and was acting in the scope of employment," *Kolstad*, 527 U.S. at 542, as long as it has not engaged in "good faith efforts to comply with Title VII," *id.* at 544.

### 1. The evidence

Viewed under the proper standard, there was ample evidence to support the jury's verdict. FedEx does not dispute that Treman and the other managers at FedEx's Belleville location were employed in a managerial capacity and were acting in the scope of employment when they allegedly discriminated and then retaliated against Hubbell. And the testimony at trial about FedEx's anti-discrimination training itself provides support for the jury's finding that Hubbell's managers acted with malice or reckless disregard toward her federally protected rights. *See New Breed Logistics*, 783 F.3d at 1072. This is not a case, for example, where the employer was "simply . . . unaware of the relevant federal prohibition." *Kolstad*, 527 U.S. at 536–37. FedEx's arguments about its "stringent [anti-discrimination] training, policies, and procedures"

do not provide a basis to grant it judgment as a matter of law on either of the first two prongs of the *Kolstad* test.

Nor is judgment as a matter of law required based on FedEx's argument under *Kolstad*'s third prong that it made good-faith attempts to comply with Title VII. FedEx relies on the Fourth Circuit's holding in *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 548 (4th Cir. 2003), that a hospital was protected from vicarious liability based on its good-faith efforts because it had "an extensively implemented organization-wide" anti-discrimination policy. The law in this circuit, however, is that a written anti-discrimination policy does not by itself shield an employer from punitive damages. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 532–33 (6th Cir. 2005).

Moreover, it is far from clear that FedEx's anti-discrimination policy was "extensively implemented." In this case, as in *Tisdale*, there was significant evidence in the record that "call[ed] into question FedEx's sincerity to abide by its own written policies." *Id.* at 533. Most notably, Jessica Benjamins, FedEx's corporate Human Resources manager, testified that if an employee had complained to her of gender discrimination, her next step would be to open an investigation. But she had not seen a report of any investigation by FedEx into Hubbell's reports of discrimination and retaliation. Benjamins, FedEx's own witness, further testified that she did not know if FedEx followed its own policies in this case.

FedEx argues that Hubbell improperly "relies on testimony from witnesses who simply were not aware that an investigation *did* take place." Contrary to Hubbell's claims, FedEx asserts, "an investigation *did* take place and was documented on a FedEx Investigative Report Form." This argument is misleading at best. The investigative report form FedEx refers to does not document an investigation into Hubbell's claims of discrimination. Instead, this form documents that Guy Larsen of Human Resources investigated an allegation of aggressive behavior by a subordinate while Hubbell was still working as a lead parcel sorter, which resulted in that subordinate's termination. The only possible reference to her allegations of sex discrimination is a notation that Larsen "was visiting with Ms. Hubbell tied to a separate concern that she had with her performance review." Thus, though it is technically true that Larsen "documented Hubbell's allegations," an investigation took place, and an employee was discharged, as FedEx claims, all of that pertains to an unrelated matter. FedEx's description of

this document cannot cloak the failure of its Human Resources Department to conduct any investigation into Hubbell's complaint of gender discrimination.

Relying on the testimony that any investigation into an EEOC complaint "would be handled by [FedEx's] legal department," FedEx also argues that "[i]t is not accurate to say that FedEx never investigated, only that the *HR Department* did not." This is an implicit concession that FedEx's Human Resources department never investigated Hubbell's claims of gender discrimination. Moreover, FedEx's argument depends on a suggestion that its legal department investigated Hubbell's complaints even though there is no evidence in the record to indicate that *any* FedEx department investigated Hubbell's claims of sex discrimination. Accordingly, a reasonable factfinder could determine that, despite its formal anti-discrimination policy, FedEx did not engage in good-faith efforts to comply with Title VII.

### 2. The initially inconsistent verdict

FedEx argues in the alternative that the jury's initial finding that it acted in good faith should bar Hubbell's punitive-damage claim. As FedEx points out, the special verdict form explicitly instructed the jury that if it found FedEx had "made a good-faith effort to comply with the law prohibiting gender discrimination," it was not to proceed to the question of punitive damages. Yet the jury marked both that FedEx made a good-faith effort and proceeded to award Hubbell punitive damages.

FedEx argues that "[i]t was error for the district court to re-instruct the jury on this point rather than simply enter judgment for FedEx on Hubbell's claim for punitive damages." But FedEx does not provide any authority for this proposition. Nor does it argue that the court's supplemental jury instruction was misleading or coercive. And the record would not support such an assertion. The court simply noted that the jury's verdict on questions 10 and 11 were not "compatible with one another" then instructed the jury to "decide whether you have properly answered Question Number 10, in which case . . . you want to mark out -- obliterate the findings in Question Number 11," or whether instead "you mistakenly marked yes in Question Number 10," in which case the jury should consider again the amount of punitive damages it wished to award.

At bottom, FedEx's argument seems to be that the jury's initial indication that FedEx acted in good faith precluded punitive damages as a matter of law, despite the jury's expressed intention to award punitive damages.  That argument is inconsistent with the weight of precedent.  In *Hopkins v. Coen*, we stated that when a jury returns an inconsistent verdict, the trial court should "poll the jury or send it back to the jury room to further deliberate with appropriate instructions to bring back consistent verdicts."  431 F.2d 1055, 1059 (6th Cir. 1970).  Our sister circuits agree that a trial court has the authority to resubmit an apparently inconsistent verdict to the jury with appropriate instructions.  *See, e.g.*, *Witkowski v. Int'l Bhd. of Boilermakers*, 404 F. App'x 674, 678–79 (3d Cir. 2010); *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1059–60 (9th Cir. 2003); *Hafner v. Brown*, 983 F.2d 570, 575–76 (4th Cir. 1992); *Hauser v. Kubalak*, 929 F.2d 1305, 1308 (8th Cir. 1991).

FedEx speculates that the verdict form "revealed no confusion regarding the jury's verdict; the jury (a) believed that FedEx had acted in good faith, . . . but nonetheless (b) wanted to award punitive damages. . . .  Following the re-instruction, the jury did what was necessary to award punitive damages despite clearly finding no basis for such damages to be awarded . . . ."  But FedEx points to no record evidence to support its speculation that the jury flouted the law in imposing punitive damages rather than simply rectifying its initial confusion in filling out the special verdict form—and there is none.  FedEx's argument also flies in the face of the general rule that "[a] jury is presumed to follow its instructions."  *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012) (quoting *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).  The district court did not err in re-instructing the jury following its initial inconsistent verdict.

We therefore affirm the denial of judgment as a matter of law on punitive damages.

**C. Attorney's Fees**

Finally, Hubbell cross-appeals the reduction of her attorney's fees by the district court. She argues that because FedEx did not object to her requested fees, the district court was required to award her the amount requested.  She also argues that the district court erred by failing to follow Michigan law in awarding attorney's fees, as well as by deviating from its

practice of permitting block billing in past cases, and that the fees requested were reasonable. FedEx counters that the district court's reduction of fees was not an abuse of discretion.

This circuit reviews the district court's award of attorney's fees for abuse of discretion, "defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013) (quoting *Revis v. Meldrum*, 489 F.3d 273, 280 (6th Cir. 2007)). "In light of a district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters, an award of attorneys' fees . . . is entitled to substantial deference.'" *Wilson-Simmons v. Lake Cty. Sheriff's Dep't*, 207 F.3d 818, 823 (6th Cir. 2000) (citation omitted). We have found an abuse of discretion requiring a remand for reconsideration, however, "where a district court fails to explain its reasoning adequately or to consider the competing arguments of the parties." *Minor v. Comm'r of Social Sec.*, 826 F.3d 878, 883 (6th Cir. 2016) (citation omitted).

To determine reasonable attorney's fees, a district court is required to "begin[] by determining 'the fee applicant's lodestar, which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate.'" *Waldo*, 726 F.3d at 821 (quoting *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)). The court is then to consider adjusting the fee based on a number of factors, the most important of which "is the degree of success obtained." *Id.* at 822 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

In a detailed 17-page opinion, the district court awarded plaintiff $157,733.75 in attorney's fees. That amounted to less than half the attorney's fees requested by lead counsel: He was granted $105,446.25 ($325 x 324.45 hours) instead of $241,200 ($450 x 536 hours).

The court first assessed the hourly rate requested by counsel, finding that the rate requested for co-counsel ($250 an hour) was reasonable but that the rate requested by lead counsel ($450 an hour) was somewhat high, reducing it to $325 an hour. The court detailed statistics showing that $325 an hour was above the 75th percentile for a solo practitioner like lead counsel and above the median pay for lawyers at his level of experience and attorneys

practicing employment law in Michigan. It was at the 75th percentile for attorneys with offices in the same county as counsel.

The court next calculated a reasonable expenditure of hours by examining the attorneys' billing records. The court noted that many of the time entries were vague, redundant, block billed, or apparently billed in quarter-hour increments. Because it was difficult "to determine what discrete tasks each attorney completed, how much time they spent on each task, and whether their time is redundant," the court reduced their billed hours by 35 percent. (Plaintiff responds that in fact counsel billed his time in five-minute increments that sometimes resulted in billings for a quarter or half an hour.)

Finally, the court looked at a number of case-specific factors used by Michigan courts to determine whether to adjust the lodestar. The court determined that no adjustment was appropriate because this was a "run-of-the-mill discrimination, retaliation, and hostile work environment case," and the results were "favorable" but "not so unique that an increase is warranted." The court did not respond to counsel's argument that he deserved an upward adjustment of the lodestar for an extraordinary result because the jury verdict was not only far greater than the defendant's final settlement offer of $60,000, it was also greater than the statutory cap on damages.

The district court presided over the entire litigation process and accordingly its determination of a reasonable expenditure of time for this case is entitled to substantial deference. Although the reduction was substantial, we cannot say that the court exceeded the scope of its authority in reducing the number of billed hours by 35 percent due to the lack of specificity and duplication in the attorneys' billing records. We have reversed trial courts for abusing their discretion only in cases involving far more drastic cuts, with less explanation. *See, e.g.*, *Minor*, 826 F.3d at 883–84 (more than 65%); *Ohio Right to Life Soc'y, Inc. v. Ohio Elections Comm'n*, 590 F. App'x 597, 604 (6th Cir. 2014) (85%). Here, on the other hand, the district court awarded lead counsel fees for over 300 hours and co-counsel fees for over 200 hours. *Cf. McNeel v. Farm Bureau Gen'l Ins. Co. of Michigan*, 795 N.W.2d 205, 218–221 (Mich. Ct. App. 2010) (holding that court abused its discretion by reducing attorney's fees to 43 hours, in a case that went to trial).

As for cutting lead counsel's requested hourly rate of $450 an hour to $325 an hour, another court may not have cut this rate so much considering counsel's track record of success and the results in this case. Although the district court correctly noted that Hubbell "prevailed on her retaliation claims alone," the initial jury verdict was greater than the statutory cap on damages. Even if Hubbell had prevailed on all her claims, she could not have recovered any more money under Title VII. And she won far more than the final settlement offer of $60,000. Nevertheless, we review the trial court's determination only for abuse of discretion. We cannot say that the rate reduction was reversible error given that counsel had previously been awarded $300 an hour and $325 an hour was more than the median pay for an attorney in the area with his level of experience.

Plaintiff's other arguments that the district court abused its discretion are also unavailing. Plaintiff claims the court was required to award her the amount requested because FedEx did not oppose the request. She describes this as the "rule," citing to district court cases where courts have simply approved unopposed attorney's fees request and concluding that the court "failed to follow the applicable law." But just because district courts—or even this court—have done so in some cases does not mean that the court is *required* to do so. Indeed, adopting such a rule would be in considerable tension with this circuit's caselaw requiring district courts to calculate the "lodestar" and then any applicable adjustments. *See, e.g.*, *Waldo*, 726 F.3d at 821–22 (collecting cases). It would also be inconsistent with the statutory language allowing for attorney's fees in Title VII actions, which states that "the court, *in its discretion*, may allow the prevailing party . . . a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k) (emphasis added).

Hubbell's argument that the district court erred by failing to apply Michigan law also fails. Counsel is correct that the trial court did not discuss the leading Michigan Supreme Court case on attorney's fees, *Pirgu v. United Servs. Auto Ass'n*, 884 N.W.2d 257 (Mich. 2016). But *Pirgu* requires courts to look to the "*Wood* and MRPC 1.5(a) factors" in awarding fees. *Id.* at 264. Although the exact list of factors it considered may have varied slightly from those listed in

*Pirgu*, that is what the court did here.[4]  Prior cases involving the same judge's award of fees are irrelevant.

In sum, we cannot say that the district court exceeded its broad discretion.  Accordingly, we affirm the award of attorney's fees.

### III.  CONCLUSION

Because there was sufficient evidence to support the jury's verdict on liability and punitive damages, and because the district court did not abuse its discretion in awarding Hubbell less than the full amount of attorney's fees requested, we **AFFIRM** the district court's judgment.

---

[4]For the purpose of addressing this argument we assume, without deciding, that the district court was required to apply Michigan law in awarding attorney's fees (as in diversity-jurisdiction cases) even though the bulk of the damages were awarded under Title VII.  We therefore deny as unnecessary plaintiff's motion for us to take judicial notice of the district court's application of Michigan law in its January 22, 2019 order awarding costs to the plaintiff.