**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0699n.06**
**No. 19-2381**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Dec 16, 2020
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| LEGAL ADVOCACY, P.C.; | ) COURT FOR THE EASTERN |
| NORMAN YATOOMA, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendants-Appellants. | ) |
| | ) |

BEFORE: SILER, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

This is a debt-collection lawsuit. Plaintiff PNC Bank loaned $1.5 million to defendant Legal Advocacy, P.C., a Michigan law firm, and Legal Advocacy's promise to pay was further secured by a commercial guaranty executed by its principal and sole shareholder, defendant Norman Yatooma. Everyone agrees that Legal Advocacy owed the money, and that it and Yatooma failed to pay. The primary issue on appeal is whether the statute of limitations had run by the time PNC Bank filed suit against defendants. The district court held that the statute of limitations had not run, even though the suit was filed more than six years after PNC Bank called the loan due, because Legal Advocacy's partial payments after its default renewed the statute of limitations. We agree and affirm the district court's grant of summary judgment in favor of plaintiff. We also affirm the district court's award of contractual attorney's fees.

I.

In August 2008, defendant Legal Advocacy, P.C., obtained a $1.5 million line of credit promissory note (the "Note") from plaintiff PNC Bank, which was secured by a commercial guaranty executed by Legal Advocacy's principal and sole shareholder, defendant Norman Yatooma. Legal Advocacy agreed to make interest-only payments on the 27th day of each month and stipulated that all sums owed under the Note would be payable upon PNC Bank's demand.

Within one year of inking the Note, Legal Advocacy had withdrawn the entire $1.5 million in available credit. All the while, it made interest-only payments, never touching the outstanding balance. Then, in early 2010, plaintiff says it requested that Legal Advocacy supply new documentation for the loan and updated financial reports with a March 15, 2010 deadline for submission of the records. Legal Advocacy failed to do so, and on April 30, 2010, PNC Bank put Legal Advocacy in default and made demand for Legal Advocacy to repay the loan not later than June 30, 2010. Legal Advocacy did not pay, so PNC Bank sent a second demand letter in July 2010.

The next several months produced many emails, letters, and phone calls centered on curing Legal Advocacy's default. On August 2, 2010, PNC Bank's counsel, Doug Bernstein, wrote to Yatooma, stating that "although litigation is a possibility, it is and has been the Bank's desire to have the account satisfied on an amicable basis, if at all possible." Therefore, the bank was "willing to consider entering into a forbearance agreement, which may allow the parties to proceed without the need of a lawsuit," conditioned on Yatooma supplying the financial information that the bank had sought earlier that year. About a week later, Yatooma exchanged more emails with Bernstein. Yatooma told Bernstein that he had previously "discussed a settlement offer" with Steven Arco, an executive of the bank, and that he had not heard back. However, Yatooma also

indicated that he could not engage further because he was busy and requested that he have until the end of the month to respond to PNC Bank's forbearance proposal. The discussions continued into September 2010, but the parties made little progress. On September 27, 2010, Legal Advocacy made its normal interest-only payment on the Note, despite being in default. The payment was not accompanied by any declaration that Legal Advocacy was disclaiming liability for the entirety of the outstanding debt.

Then, on October 6, 2010, Yatooma wrote to confirm a telephone conversation he had with Bernstein about his firm's financial information. Specifically, he requested that PNC Bank speak directly to Plante Moran[1] to receive "unfettered answers and information" about his firm's "financial position." Importantly, Yatooma stressed that "[a]s evidenced by the Firm's continuing payments even since [it] has been defaulted, it is the Firm's intention to amicably resolve this default, which was unexpected in light of the full and timely payments being made to PNC each month." Later in the email, he returned to Legal Advocacy's continued payments, suggesting that "with payments still being made, it costs PNC nothing to have this conversation [about the Firm's financials] with Plante Moran but it could save them everything, at least as far as this loan is concerned." The next week, Bernstein wrote to Yatooma to tell him that his proposal had been rejected by PNC. However, the bank proposed a "90-day extension/forbearance arrangement," to finalize a formal, written agreement, designed to allow Yatooma to find alternative financing while remaining in compliance with the Note. Yatooma accepted.

On October 22, 2010, PNC Bank and Yatooma participated in a conference call regarding this offer. Yatooma insists that he told plaintiff that he could not pay the note balance or supply

---

[1]The record is not entirely clear on this point, but it seems Legal Advocacy engaged Plante Moran for accounting services.

additional collateral for the loan.  However, four days later, Yatooma made another interest-only payment on the Note—on the usual day and in the usual amount and manner as all previous payments.

The October 2010 payment was the last Yatooma or Legal Advocacy made on the Note. But discussions involving Yatooma's provision of Legal Advocacy's financial information continued into Summer 2011.  The parties eventually came to terms on a confidentiality agreement, and Legal Advocacy eventually sent its financial records to PNC Bank, but no further pact to return Legal Advocacy to compliance on the Note was reached.

About five years later, in August 2016, PNC Bank sent an updated demand letter to Legal Advocacy requesting full payment in ten days.  Legal Advocacy declined to make any payment, so the bank filed suit in the Eastern District of Michigan on September 9, 2016.  Quickly, the litigation focused on the statute of limitations, eventually culminating in the district court's post-discovery grant of summary judgment in favor of PNC and against Legal Advocacy and Yatooma as to liability.  The district court then denied defendants' motion for reconsideration, and later entered judgment in favor of plaintiff in the amount of $2,141,524.68, including attorney's fees of $165,450.50.  Defendants appealed.[2]

## II.

## A.

We begin with the district court's grant of summary judgment in favor of plaintiff and against Legal Advocacy, which we review de novo.  *Moran v. Al Basit LLC*, 788 F.3d 201, 204

---

[2]Defendants filed their notice of appeal after their motion for reconsideration was denied but before the district court entered a final judgment.  We held the appeal in abeyance pending the judgment, the entry of which conveyed appellate jurisdiction to our court.  *See Gillis v. U.S. Dep't of Health & Hum. Servs.*, 759 F.2d 565, 569 (6th Cir. 1985).

(6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019). All reasonable inferences will be drawn in favor of the non-moving party. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Grp.*, 585 F.3d 946, 949 (6th Cir. 2009).

Here, the district court concluded that there was no material dispute of fact that the statute of limitations had not run on PNC Bank's claim arising out of Legal Advocacy's breach of the Note, and therefore granted summary judgment in favor of plaintiff. The statute of limitations for a breach of contract claim in Michigan is six years, beginning on the date the contract was breached. Mich. Comp. Laws § 600.5807(9); *see also Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 105 (Mich. 2014). Therefore, the limitations period began either when plaintiff notified Legal Advocacy that it was in default on April 30, 2010 or when Legal Advocacy failed to make the requisite payment on June 30, 2010. And because PNC Bank did not file suit until September 2016, it would ordinarily be barred by the statute of limitations in either case.

However, it is well-established in Michigan that a partial payment on a loan serves to restart the statute of limitations. *See, e.g.*, *Yeiter v. Knights of St. Casimir Aid Soc'y*, 607 N.W.2d 68, 71 (Mich. 2000) (per curiam). Such a payment "operates as an acknowledgment of the continued

existence of the demand and as a waiver of any right to take advantage by plea of limitations of any such lapse of time as may have occurred previous to the payment being made." *Id.* at 71 n.6. But like most legal rules, Michigan's partial-payment doctrine is subject to exception: "[A] partial payment restarts the running of the limitation period *unless* it is accompanied by a declaration or circumstance that rebuts the implication that the debtor by partial payment admits the full obligation." *Id.* at 71 (emphasis added) (citing *Miner v. Lorman*, 22 N.W. 265 (Mich. 1885)). After a thorough review of the record, the district court determined that Legal Advocacy's September 2010 and October 2010 loan payments revived the statute of limitations because Legal Advocacy was not able to point to either a declaration or particular circumstances that served to rebut the implication that its partial payments were an admission that it owed the full amount.

Now on appeal, defendants baldly assert that the district court's decision was error. We disagree. The district court reasoned that Legal Advocacy's course of conduct—making interest-only payments on the same day every month from 2008 through September and October 2010— was highly probative evidence that the payments were not made solely for settlement purposes. And it reinforced that understanding of the payments by referring to Yatooma's deposition testimony, where he testified that he did not "dispute then or now [that] the loan document required [him] to make those payments[,] and [he] was making [the] payments even when the bank defaulted [him]." He continued, "I was honoring the agreement. I was making those payments every month." While defendants now try to recast those payments as being made solely to settle the debt, we agree with the district court that there is no record evidence from which a reasonable juror could conclude that the payments were required by PNC Bank for settlement. Therefore, any reasonable juror would find that the statute of limitations had not run, and the district court properly granted summary judgment in favor of plaintiff on its claim against Legal Advocacy.

B.

We next briefly take up the district court's grant of summary judgment against Yatooma personally for breach of the commercial guaranty. On appeal, Yatooma claims that the statute of limitations had run on any claim arising out of his breach of the guaranty. The district court rejected this argument because the plain terms of the agreement included a waiver of any statute of limitations defense. Yatooma gives us no reason to doubt that conclusion on appeal, so we adopt the reasoning of the district court and affirm the grant of summary judgment in favor of PNC Bank and against Yatooma for breach of the guaranty.

III.

We now move to defendants' appeal of the contractual attorney's fee award made by the district court in the amount of $165,450.50. Contractual attorney's fees are an element of damages for breach of contract. *See Pransky v. Falcon Grp., Inc.*, 874 N.W.2d 367, 383 (Mich. Ct. App. 2015); *see also Poly-Flex Const. Inc. v. Neyer, Tiseo & Hindo, Ltd.*, 600 F. Supp. 2d 897, 907–08 (W.D. Mich. 2009). "Where a district court has awarded attorneys' fees under a valid contractual authorization, we recognize that it has broad discretion in doing so, and an award of such fees may be set aside only for abuse of discretion." *Graceland Fruit v. KIC Chems., Inc.*, 320 F. App'x 323, 325 (6th Cir. 2008) (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 74 (2d Cir. 2004)). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007) (citation omitted).

When determining what constitutes a "reasonable" fee award, we direct district courts to begin by calculating the applicant's "lodestar" figure. *Bldg. Serv. Loc. 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995). In doing so, the number

of hours reasonably spent is multiplied by a reasonable hourly rate in the community for similar work. *Id.* "The essential goal . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). After the lodestar is determined, the district court may adjust the award if it "does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).

We hold that the district court did not abuse its discretion in awarding PNC Bank the attorney's fees it incurred to collect on the debt. First, we see no error in the district court's refusal to discount plaintiff's counsel's billing rate to $190.00 or $225.00 based on an inadvertent billing error. Nor do we see any reason to reduce the award to account for time expended by plaintiff's counsel in state court litigation to collect on the debt. The district court reasoned that the state court litigation fell within the scope of the contractual attorney's fees clause within the contract, and defendants have given us no reason to doubt that conclusion. Next, in a mostly redundant fashion, defendants claim that the totality of the circumstances required the district court to reduce the fee award because the federal action was a straightforward debt-collection suit. However, defendants fail to consider that the standard of review requires more than a showing that our court should balance the factors differently than the district court did. *See Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 575 (6th Cir. 2019). And finally, defendants protest that the district court entered its award of attorney's fees without holding an evidentiary hearing. However, an evidentiary hearing is not required where "the parties [have] created a sufficient record to review the issue, and the court fully explained the reasons for its decision." *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 604 (Mich. Ct. App. 1999); *see also Poly-Flex Constr. Inc.*, 600 F. Supp. 2d at 916. That is the case here.

In sum, we affirm the district court's award of $165,450.50 in attorney's fees to PNC Bank.

IV.

For these reasons, we affirm the judgment of the district court.